## IMPROVEMENT COMPANY *v.* SLACK.

The "Argilite Mining and Manufacturing Company" was incorporated by an act of the General Assembly of Kentucky passed March 4, 1865. Its name, by an amendment to the charter, was changed to the "Kentucky Improvement Company," and it was authorized to "construct one or more rail tracks from any lands owned or improved by said corporation to convenient points on the Ohio or Little Sandy River, or both, or to connect with other railways, and to maintain said track or tracks, and to draw cars over the same by suitable motive power." For the "construction and convenient and proper use and maintenance of such railroads" the company was authorized to condemn and appropriate the necessary lands and materials. Pursuant to said authority, the company built and equipped a railroad, and on Aug. 15, 1866, issued in payment therefor its six per cent coupon bonds to the amount of $500,000, secured by mortgage on its landed property and improvements. The road was finished in June, 1868, and thereafter the company transported over it its own freight, officers, and agents, and in addition thereto, though not in terms so authorized by the charter, from time to time other passengers and freight for hire. *Held*, that the company was, within the meaning of the ninth section of the act of July 13, 1866 (14 Stat. 138), a railroad company, and as such, for the year 1870, liable to the tax of five per cent on coupons thereby imposed.

ERROR to the Circuit Court of the United States for the District of Massachusetts.

This was an action brought by the Kentucky Improvement Company against Charles W. Slack, collector of internal revenue for the third collection district of Massachusetts, to recover the amount of certain internal-revenue taxes which, it was alleged, had been erroneously and illegally assessed and collected.

The case was submitted to the court below upon the following agreed statement of facts : —

" After an appeal duly made to the Commissioner of Internal Revenue (April 29, 1873), this suit was brought against

the collector to recover the sum of $750, paid to him May 24, 1870, being a tax of five per cent assessed upon coupons to the amount of $15,000, payable Feb. 15, 1870, on bonds of said company to the amount of $500,000, dated Aug. 15, 1866, and bearing interest at the rate of six per cent, payable semi-annually.

" The company was originally organized under an act of the General Assembly of the Commonwealth of Kentucky, approved March 4, 1865, by the name of the ' Argilite Mining and Manufacturing Company,' which act provided as follows : —

" ' SECT. 2. The objects and purposes of the incorporation of said company shall be the mining for coal, iron ore, petroleum, carbon, or rock oil, and any and all other minerals or mineral substances, or the direct products of the earth, or any or all of them, and the manufacture and refining of any or all of them, and transportation tc market of the same ; the location and field of mining and manufacture of said company shall be in Greenup, or any of its adjoining counties.'

" ' SECT. 7. Said company shall have the power, and may, if they choose so to do, lock and dam Little Sandy River up to their mines and property : *Provided,* for the condemnation of lands and property for said purpose the proceedings shall be had as is now provided by law for the condemnation of mill sites.

" ' SECT. 8. Said company shall have the power to take, acquire, and hold such lands, mines, and mining rights as they may deem necessary for the uses of said company, and all such personal property, machinery, boats, flats, &c., as may be necessary, and to dispose of, for the use of the company and the stockholders, any or all of the same.'

" It was enacted by an act of the said General Assembly, approved December 14, as follows : —

" ' SECT. 1. That the name of the " Argilite Mining and Manufacturing Company " is hereby changed, and said corporation shall hereafter be known and styled the " Kentucky Improvement Company." '

" ' SECT. 4. The said corporation is hereby authorized to construct one or more rail tracks from any lands owned or improved by said corporation to convenient points on the Ohio or Little Sandy River, or both, or to connect with other railways, and to maintain said track or tracks, and to draw cars over the same by

suitable motive power. The company is hereby authorized to condemn and appropriate such lands and materials as may be necessary for the construction and convenient and proper use and maintenance of such railroads : *Provided*, that for the condemnation of the lands and materials for such purpose the same proceedings shall be had as are now required by law for the condemnation of lands and materials for turnpikes and plank-roads: *Provided, further*, that the land condemned for any railroad track shall not exceed in width one hundred feet.

" ' SECT. 5. That, in order to carry out to the fullest extent the purposes and objects of said act of incorporation, the said company is authorized to sell all minerals, mineral substances, products of the earth, and all other articles of commerce and manufacture lawfully possessed by them, and to buy and sell all such articles of merchandise as may be required to carry out- the objects of their charter, and to establish agencies in any part of the United States, for the prosecution of the traffic hereby authorized.

" ' SECT. 6. That, should said company lock and dam the Little Sandy River, they shall build two bridges over said river sufficient for the public travel, one of the bridges to be at the crossing of the Greenupsburg and Raccoon Furnace Road, and the other at the crossing of the Greenupsburg and Grayson Road, at or near the Argilite Mills.

" " The Kentucky Improvement Company was duly organized under the acts aforesaid, and commenced and continued operations thereunder until it ceased to exist, about March 1, 1870.

" At an adjourned meeting of the shareholders of said company, held on the 24th of July, 1866, it was resolved, —

" ' 1st, To authorize the building of a railroad and to provide locomotives, cars, and other facilities for the transportation of coal and other productions to market for the canal openings near Hunnewell Furnace to Hockaday's Landing, on the Ohio River.

" ' 2d, That a sum not exceeding $500,000 be raised for the purpose of building and equipping said railroad, and afford facilities for transportation to market for the mineral and other productions of the company's property.

" ' 3d, That the president and board of directors of this company be, and they hereby are, authorized and empowered to issue bonds to the amount of $500,000, . . . secured by an indenture of mortgage on all their present landed property and improvements . . . bearing six per cent interest, the interest payable semi-annually.'

" In pursuance of the above vote, an issue of bonds was made to the amount and bearing the interest named, and of date Aug. 15, 1866, and was secured by a mortgage to trustees of even date of the then landed property and improvements of said company, and the coupons taxed in this case were a part of the coupons attached thereto.

" The whole issue was duly subscribed for and delivered to the subscribers. The road was finished and opened for the business of the company about the 1st of June, 1868.

" In addition to its own freight and its own officers and servants, the company transported over its road from time to time for hire other passengers and freight, but there was no provision in its charter in terms authorizing it to convey freight or passengers other than its own.

" The receipts of the company were as follows : —

|  | OTHER THAN COMPANY. | | Company's iron freight. |
|---|---|---|---|
|  | Passenger receipts. | Freight receipts. |  |
| **1868.** | | | |
| July . . . . . . . . . . . . . . . . . | $68.50 | $96.40 | $815.95 |
| August . . . . . . . . . . . . . . . | 133.75 | 63.13 | 1,183.22 |
| September . . . . . . . . . . . . . | 220.20 | 20.00 | 1,075.22 |
| October . . . . . . . . . . . . . . | 165.00 | 44.35 | 1,461.30 |
| November . . . . . . . . . . . . . | 170.50 | 5.25 | 1,586.93 |
| December . . . . . . . . . . . . . | 322.50 | 107.77 | 1,356.60 |
| January . . . . . . . . . . . . . . | 218.75 | 112.43 | 1,666.60 |
| February . . . . . . . . . . . . . | 222.50 | 132.30 | 1,680.08 |
| March . . . . . . . . . . . . . . . | 403.25 | 119.55 | 1,958.73 |
| April . . . . . . . . . . . . . . . | 224.00 | 104.35 | 1,842.57 |
| May . . . . . . . . . . . . . . . . | 249.50 | 78.80 | 2,339.88 |
| June . . . . . . . . . . . . . . . . | 219.10 | 47.45 | 2,347.00 |
| July . . . . . . . . . . . . . . . . | 272.50 | 87.57 | 1,378.51 |
| August . . . . . . . . . . . . . . . | 328.90 | 510.60 | 1,605.14 |
| September . . . . . . . . . . . . . | 413.20 | 116.82 | 1,017.27 |
| October . . . . . . . . . . . . . . | 214.90 | 473.11 | 991.05 |
| November . . . . . . . . . . . . . | 262.20 | 503.52 | 1,380.21 |
| December . . . . . . . . . . . . . | 351.05 | 797.66 | 1,648.70 |
| **1870.** | | | |
| January . . . . . . . . . . . . . . | 278.50 | 332.30 | 1,569.84 |
| February 1–15 . . . . . . . . . . | 130.00 | 80.00 | 805.00 |
| | $4,868.80 | $3,833.36 | $29,709.80 |

" The company's sales of coal were as follows : —

| | |
|---|---:|
| 1866, April 1 to Dec. 31 | $774.71 |
| 1867, Jan. 1 „ „ | 324.33 |
| 1868, „ „ „ | 25,576.82 |
| 1869, „ „ „ | 40,909.01 |
| 1870, „ „ Feb. 15 | 6,541.55 |
| | $74,126.42 |

" And the company produced for its own use during same period as follows : —

| | |
|---|---:|
| 1866 | 356.16 tons |
| 1867 | 5,433.55 „ |
| 1868 | 2,286.78 „ |
| 1869 | 792 „ |
| 1870 | 60 „ |

" And the company's sales of iron were : —

| | |
|---|---:|
| 1866, April 1 to Dec. 31 | $49,071.16 |
| 1867, Jan. 1 „ „ | 95,846.46 |
| 1868, „ „ „ | 161,735.46 |
| 1869, „ „ „ | 145,812.15 |
| 1870, „ „ Feb. 15 | 18,204.13 |
| | $470,669.36 |

" And the company's sales at its stores on the ground during same period amounted to $506,529.75."

The court below found for the defendant, whereupon the company sued out this writ of error.

*Mr. Francis W. Palfrey* for the plaintiff in error.

The company was a mining, not a railroad company. It constructed and operated the railroad for its own special uses.

The primary object of a railroad company is commerce and transportation. *Railroad Company* v. *Peniston*, 18 Wall. 49.

Railroad companies are carriers for hire. *Chicago, Burlington, & Quincy Railroad Co.* v. *Iowa,* 94 U. S. 155.

A corporation created by statute can exercise no powers and has no rights except such as are expressly given or necessarily implied. *Huntington* v. *Savings Bank*, 96 id. 388.

" Express power is invariably given (if intended to be conferred) to the railroad company to equip its road, and to trans-

port goods and passengers thereon and charge transportation therefor. This practice evidently springs from the conviction that a railroad company is not necessarily a transportation company, and that, to make it such, express authority must be given for that purpose, in compliance with the rule that no power is conferred upon a corporation which is not given expressly or by clear implication." *Lake Superior & Mississippi Railroad Co.* v. *United States*, 93 id. 442.

In this case there is no indication that the convenience of the public was considered,—there is not a word said in the charter about general commerce, general transportation, rates of toll, rates of fare, common carriers, depots, or stations. On the contrary, the charter points to the construction and use of a track or tracks for the business of the company. The legislature of Kentucky contemplated the creation not of a railroad company, but of a mining and manufacturing company with permission to construct and use a set of tracks for its own special purposes; and the action of the company was in accordance with the grant.

But if the court shall be of opinion that the company was a railroad company within the meaning of the act, it was certainly not *a* railroad company indebted for any money for which bonds had been issued."

The company; while it was a mining and manufacturing company and nothing else, voted " to authorize the building of a railroad . . . for the transportation of coal and other productions to market. . . .

" That a sum . . . be raised for the purpose of building and equipping said railroad, and afford facilities for transportation to market for the mineral and other productions of the company's property ; . . . to issue bonds . . . secured by an indenture of mortgage on all their present landed property and improvements."

Upon this showing, it is submitted that, even if the company shall be held to have afterwards become a railroad company, it could not, by such acts, become a railroad company indebted for money, &c., within the language of the act.

Suppose the company, instead of building the road it did build, had built a short track from one of its furnaces to another, and occasionally carried a passenger or a parcel over such

track for hire, could it be properly claimed that such action constituted it a railroad company, and subjected the coupons on its total bond issue to the internal-revenue tax ?

Or suppose that, instead of issuing bonds to the amount of $500,000, it had issued bonds to the amount of $1,000,000, and used half the proceeds for opening mines and half for building a railroad, could it be properly claimed that it should pay the internal-revenue tax on the coupons on its whole issue ?

Nor will it do to say that, even if it was not a railway company, it might receive and pay the internal-revenue tax as an agent of the government to collect the income tax from its bondholders.    That such tax was an income tax is settled by *Haight* v. *Railroad Company*, 6 Wall. 15 ; *Railroad Company* v. *Jackson*, 7 id. 262 ; *United States* v. *Railroad Company*, 17 id. 322 ; *Stockdale* v. *Insurance Company*, 20 id. 323 ; *Railroad Company* v. *Rose*, 95 U. S. 78.

But if this court shall be of opinion that the plaintiff in error was not only a railroad company, but a railroad company indebted, &c., within the language of the act, then we submit that it was clearly protected against the tax by the proviso in the act of July 13, 1866.    14 Stat. 139.

*The Solicitor-General, contra.*

MR. JUSTICE CLIFFORD delivered the opinion of the court.

Moneys involuntarily paid for internal-revenue taxes illegally exacted may be recovered back from the collector in an action of assumpsit.

Taxes of the kind, to the amount of $750, were paid to the collector by the plaintiffs, after an unsuccessful appeal to the Commissioner.    Redress being refused, the plaintiffs instituted the present suit in the State court, where the defendant appeared and removed the cause into the Circuit Court for the same district.    Subsequently both parties appeared in the Circuit Court and submitted the cause to the Circuit Court upon the agreed statement of facts exhibited in the transcript.

Bonds with coupons annexed, it appears, were issued by the plaintiff company in the sum of $500,000, bearing interest at the rate of six per cent, payable semi-annually.    Sufficient appears also to show that the tax in question was a tax of five

per cent upon $15,000 of those coupons which fell due at the time specified in the agreed statement. Payment of the tax was resisted upon the ground that the plaintiffs were not a railroad company, and the claim to recover back the money paid for the tax, with interest, is made upon the same ground. Judgment was rendered in favor of the defendant in the Circuit Court, and the plaintiffs sued out the present writ of error.

Errors assigned in this court are as follows: 1. That the Circuit Court erred in rendering judgment for the defendant. 2. That the court erred in finding that the plaintiffs were a railroad company. 3. That the court erred in holding that the plaintiffs were not protected from paying the tax by the provision in the amendatory act. 14 Stat. 139.

When first organized under their original charter, it is doubtless true that the plaintiffs were a mining and manufacturing company, covering a very large field of operations, and with some quite extraordinary powers; as, for example, they might lock and dam Little Sandy River up to their mines and property, and for that purpose they might exercise the same power in condemning lands and property as was authorized by law for the condemnation of mill-sites.

Had the case stopped there, the question would be attended with difficulty, and perhaps would require a reversal of the judgment; but it does not stop there. Instead of that, the agreed statement shows that the name of the company was subsequently changed to that of the Kentucky Improvement Company, and the powers and privileges of the company were not only greatly enlarged, but were extended to objects and purposes other than those relating to mining and manufacturing. Authority is given to the company by the fourth section of the new act to construct one or more rail tracks from any lands owned or improved by the corporation to convenient points on the Ohio or Little Sandy River, or both, *or to connect with other railways,* and to maintain said track or tracks, and to draw cars over the same by any suitable motive power.

Under the enlarged power conferred by the new act the company may not only construct railway tracks and connect with other railways, but they may condemn and appropriate such lands and materials as may be necessary for the construc-

tion and convenient and proper use and maintenance of such railroad, without any limitation except that the same proceedings shall be had in effecting such condemnation as are required by law for the condemnation of lands and materials for turnpikes and plank-roads, and that the lands condemned for any railroad track shall not exceed in width one hundred feet.

Tested by the terms of the charter, it is clear that the powers granted were more comprehensive than are usually found in railroad charters, both in respect to the routes it may establish and the lands and materials the company may condemn and appropriate to such uses. For aught that appears to the contrary they might construct an indefinite number of tracks in any direction from their own lands, and might connect with every other railroad in the State; and in constructing such tracks or making such connections they might without limit condemn and appropriate all such lands and materials as might be necessary and convenient in constructing and maintaining the same, provided the width for the railroad track did not exceed one hundred feet.

Confirmation of the proposition that the plaintiffs are a railroad company is also derived from the evidence reported, which shows that the plaintiffs, after their road was constructed and equipped with rolling-stock, used it not only to transport their own products and manufactures, but as a public highway for the conveyance of freight and passengers.

Two suggestions are made by the plaintiffs in explanation of the evidence introduced to prove that the railroad was used for the public accommodation: 1. That the annual receipt from that source of employment was less than that derived from mining and manufacturing; but it is a sufficient answer to that suggestion to say that it does not appear that they did not accommodate all shippers and passengers who applied for any such services. 2. That the charter does not in terms authorize the company to convey freight or passengers for hire. Suppose that is so, still it remains that power is given to the plaintiffs to construct a railroad, and, if so, it must be inferred that the builders and owners of it have a right to use it, and to charge a reasonable price for its use.

Ample power to lock and dam Little Sandy River and flow the water to their property was given by the act of incorpo-

ration, nor is there any ground to suppose that that power was taken away or withdrawn by the amendatory charter, as the latter provides that if the company shall lock and .dam that river they shall build two bridges over the river, sufficient for the accommodation of the public, at the points specified in the eighth section of the act, which warrants the conclusion that the power to construct railroads and to lock and dam the river named are both included in the charter as amended. Enough appears to show that the plaintiffs adopted the act changing their corporate name, and that the company was duly organized under the new charter, and that they continued operations under it until the company ceased to exist.

Meetings were held by the stockholders, and at an adjourned meeting they resolved to authorize the building of a railroad, and to provide locomotives, cars, and other facilities for the transportation of coal and other productions to market from the canal openings to a certain landing on the Ohio River. What that distance is the resolution does not state, but it is supposed to be about twenty. miles.

They also resolved that a sum not exceeding $500,000 be raised for the purpose of building and equipping said railroad, and to afford facilities for transportation to market for the mineral and other productions of the company's property. Officers had previously been elected, and the shareholders also empowered the president and directors to issue bonds for the amount raised, to be secured by mortgage of all their landed property and improvements, the bonds bearing six per cent interest, payable semi-annually. Bonds to that amount were accordingly issued and were secured as indicated, and it appears that the coupons taxed in this case were a part of the coupons attached to those bonds.

Two years later, the railroad was finished and opened for business, and it appears that the company within one year and eight months transported passengers and freight over its railroad for hire to the amount of $8,700 in addition to their own freight and passengers not paying fare.

Viewed in the light of these suggestions, it is so clear that the plaintiffs are a railroad company, and that their road is a railroad, that it is not deemed necessary further to pursue the argument.

Grant that, and still it is insisted by the plaintiffs that the tax was illegally exacted, because the company of the plaintiffs was not a railroad company indebted for any money for which bonds had been issued.

Congress enacted to the effect that any railroad indebted for any money for which bonds or other evidences of indebtedness have been issued, subject to interest, or with coupons representing interest, shall pay a tax of five per cent on the amount of all such interest or coupons.  14 Stat. 138 ; *Barnes* v. *The Railroads*, 17 Wall. 294–299.

Express authority was given to the plaintiffs as an improvement company to construct one or more rail tracks, as before explained, or to connect with other railways, and to maintain said track or tracks and draw cars over the same, by any suitable motive power, before the plaintiffs as such improvement company resolved to build said railroad and to provide locomotives, cars, and other facilities for the purposes antecedently mentioned ; and it was for the purpose of constructing and equipping that railroad that the shareholders of the company resolved to raise the said sum of $500,000, and to issue the coupon bonds for the amount.  Coupon bonds were accordingly issued, and the record shows that the tax in question was assessed on $15,000 of such coupons.

Examined in the light of these suggestions, as the case should be, and it follows that the company of the plaintiffs was a railroad company indebted for money for which bonds had been issued.

Concede both of the preceding conclusions, and still the plaintiffs contend that they should recover, because they insist that the receipts of the company derived from the public use of their railroad were insufficient to pay the semi-annual inter est of the bonds, and that they are protected from such a tax by the proviso added by the one hundred and twenty-second section of the amendatory act.  14 Stat. 139.

Nothing is shown in support of the theory of fact assumed in the proposition, except what is found in the table exhibited in the transcript.  Even suppose that that is correct, it by no means follows that it will avail the plaintiffs in the present case, for several reasons: 1. Because, if the interest was in

fact paid by the plaintiffs, it is of no consequence where they obtained the money, it being clear that in order to raise the question there must be an actual failure to make the payment. 2. Where the interest is paid the presumption is conclusive that every other circumstance existed to justify the assessment of the tax. 3. Proof to show that the interest has never been paid is not exhibited, nor is the table referred to of a character to satisfy the court that it shows the whole amount of the pecuniary advantage which the plaintiffs derived from their railroad. Without more, these remarks are sufficient to show that each of the assignments of error must be overruled.

*Judgment affirmed.*

MR. JUSTICE FIELD, with whom concurred MR. CHIEF JUSTICE WAITE and MR. JUSTICE HARLAN, dissenting.

I dissent from the judgment of the court in this case. The construction of the short railway by the company for its own use, to carry the products of its mine to the Ohio River, did not, in my opinion, convert the Improvement Company, which was organized to mine for coal, iron, and other minerals, into a railroad company, so as to bring it within the statute providing for a tax upon the coupons of bonds issued by such companies.