**USIBELLI COAL MINE, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Jim Walter Resources, Inc., Plaintiff,**

v.

**The United States, Defendant.**

**Chafin Branch Coal Co., Inc., and Hampden Coal Co., Inc., Plaintiffs,**

v.

**The United States, Defendant.**

**Nos. 99–267T, 99–516T, 00–551T.**

United States Court of Federal Claims.

Nov. 8, 2002.

Steven H. Becker, Coudert Brothers, LLP, New York City, counsel for plaintiff Usibelli Coal Mine, Inc.

Robert M. Rolfe, Hunton & Williams, Richmond, Virginia, counsel for plaintiff Jim Walter Resources, Inc.

Alex F. Lankford, III, Hand Arendall, Mobil, Alabama, counsel for plaintiffs Chafin Branch Coal Company, Inc., and Hampden Coal Company, Inc.

Robert Stoddart, U.S. Department of Justice, with whom were Assistant Attorney General Eileen J. O'Connor, Mildred L. Seidman, and David Gustafson, counsel for defendant.

## OPINION

ALLEGRA, Judge.

This case presents an important issue of first impression. In its ground-breaking decision in *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369 (Fed.Cir.2000), *cert. denied*, 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d 208 (2001), the Federal Circuit held that this court had jurisdiction under the Tucker Act, 28 U.S.C. § 1491, over a suit filed by a taxpayer seeking monetary damages stemming from its payment of an excise tax found violative of the Export Clause of the Constitution, art. I, § 9, cl. 5. In so opining, the court held that such a suit for damages could proceed even though the taxpayer had not complied with the provisions of the Internal Revenue Code of 1986 (26 U.S.C.) [1] requiring it to exhaust various administrative remedies as a precondition to filing a tax refund suit. At issue in this case is whether a plaintiff obtaining a money judgment in such a case is entitled to prejudgment interest under section 2411 of Title 28.[2] The case is before the court on the parties cross-motions for partial summary judgment. For the reasons that follow, the court grants defendant's motion and concludes that plaintiffs are not entitled to prejudgment interest in these actions.

## I. FACTS

Neither party disputes the facts at issue here, which briefly are as follows:

1. All "Code" references are to the Internal Revenue Code of 1986 (26 U.S.C.), as amended, unless otherwise noted.

2. Post-judgment interest under section 2411 is also sought; however, such interest appears to be available, even if not authorized by section 2411. *See* 28 U.S.C. § 1961. Accordingly, in framing the issue herein, the court generally will refer to prejudgment interest.

3. Chafin Branch Coal Co., Inc., et al., and Hampden Coal Co., Inc. filed its complaint on

Plaintiffs are domestic coal producers seeking a refund of excise taxes paid on exported coal under the Black Lung Excise Tax, 26 U.S.C. § 4121 (the Coal Tax).[3] They argue, and the Internal Revenue Service (IRS) has conceded, that the Coal Tax is unconstitutional when imposed on exported coal. *See* I.R.S. Notice 2000–28, 2000–21 I.R.B. 1116 (May 22, 2000) (citing *United States v. I.B.M.*, 517 U.S. 843, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996) and *Ranger Fuel Corp. v. United States*, 33 F.Supp.2d 466 (E.D.Va.1998)). Accordingly, the IRS has begun, and in some instances, completed, processing plaintiffs' claims for a refund under this theory. The IRS has indicated that plaintiffs also are entitled to interest on "overpayments" refunded via the administrative refund process. *See* I.R.S. Notice 2000–28, 2000–21 I.R.B. 1116–17 (May 22, 2000); 26 U.S.C. § 6611.

The current motions, however, involve claims regarding the Coal Tax that are not covered by plaintiffs' administrative refund claims. That plaintiffs may proceed in this court under the Tucker Act, 28 U.S.C. § 1491(a), on claims for which they have not complied with the administrative tax refund statute is now established. *See Cyprus Amax, supra.* The subject of the cross-motions for partial summary judgment filed by plaintiffs and defendant simultaneously on October 23, 2001, is whether plaintiffs may recover prejudgment interest on judgments rendered on these Export Clause claims.[4]

## II. DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56;

September 11, 2000; Jim Walter Resources, Inc. filed its complaint on July 28, 1999; and Usibelli Coal Mine, Inc. filed its complaint on April 30, 1999.

4. Joint status reports indicate that the parties have entered settlement negotiations regarding the principal amounts claimed by plaintiffs which fall outside the three-year administrative statute of limitations, but are within the six-year statute of limitations applicable to claims under the Tucker Act.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As noted, the facts material to the motions are essentially undisputed. Based on those facts, the court concludes, as a matter of law, that defendant is entitled to partial summary judgment.

As said, at issue is whether plaintiffs are entitled to interest on any recovery herein under section 2411 of Title 28 of the U.S.Code. On this count, the court's task is to discern the "unequivocally expressed" intent of Congress, construing ambiguities in favor of immunity. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (internal quotation marks omitted); *see also United States v. Williams*, 514 U.S. 527, 531, 115 S.Ct. 1611, 131 L.Ed.2d 608 (1995).[5] To fathom Congress' intent as to section 2411, we must first consider several Code sections that supply the statutory context for this provision. The court will then consider what *Cyprus Amax* teaches regarding those provisions.

### A. Statutory Framework

We begin our quest at the outer curtain with some basic propositions. The statute generally defining subject matter jurisdiction for this court is the Tucker Act, which provides, in pertinent part, "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department ...." 28 U.S.C. § 1491(a). This statute overlaps 28 U.S.C. § 1346(a)(1), which, in deceptively simple terms, affords the federal district courts, concurrent with this court, jurisdiction over "[a]ny civil action against the United States for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected ... or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws."[6] The Supreme Court has called the latter jurisdictional provision the "keystone in a carefully articulated and quite complicated structure of tax laws." *Flora v. United States (Flora II)*, 362 U.S. 145, 157, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960); *see also Williams*, 514 U.S. at 542, 115 S.Ct. 1611.[7]

Anyone seeking to invoke either the Tucker Act or section 1346(a)(1) must pass through the portcullis of section 7422(a) of the Code, which provides, in *haec verba*, that "[n]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected ... or of any sum alleged to have been excessive or in any manner wrongfully collected ... until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard." *See Flora v. United States (Flora I)*, 357 U.S. 63, 69, 78 S.Ct. 1079, 2 L.Ed.2d 1165 (1958); *Alexander Proudfoot Co. v. United States*, 197 Ct.Cl. 219, 454 F.2d 1379, 1380 (1972). The "provisions of law" referenced in this section include section 6511 of the Code, which, *inter alia*, sets a period of limitations on the filing of such a claim.[8] "Read together," the Su-

---

5. Of course, the Supreme Court has also stated that " '[t]he exemption of the sovereign from suit involves hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction where consent has been announced.' " *United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 383, 70 S.Ct. 207, 94 L.Ed. 171 (1949) (quoting *Anderson v. Hayes Constr. Co.*, 243 N.Y. 140, 147, 153 N.E. 28, 29–30 (1926) (Cardozo, J.)).

6. Although this court is mentioned in section 1346(a)(1), early cases suggest that this is merely a cross-reference to the Tucker Act and that this court's refund jurisdiction derives from the latter provision. *See, e.g., New England Mut. Life Ins. Co. v. United States*, 72 Ct.Cl. 658, 52 F.2d 1006, 1008 (1931).

7. An excellent and much more detailed review of these provisions may be found in M. Carr Ferguson, *Jurisdictional Problems in Federal Tax Controversies*, 48 Iowa L.Rev. 312 (1963) (hereinafter "Ferguson").

8. Section 6511(a) of the Code provides, in part, that a "[c]laim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid." Relatedly, section 6532(a) of the Code, which imposes a period of limitations on suits for refunds in court, states that "[n]o suit or proceeding under section 7422(a) ... shall be begun before the expiration of 6 months from the date of filing the claim

preme Court has stated, "the import of these sections [§§ 1346(a)(1), 7422(a), 6511(a)] is clear: unless a claim for refund of a tax has been filed within the time limits imposed by § 6511(a), a suit for refund, regardless of whether the tax is alleged to have been 'erroneously,' 'illegally,' or 'wrongfully collected,' ... may not be maintained in any court." *United States v. Dalm,* 494 U.S. 596, 602, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990); *see also Williams,* 514 U.S. at 542, 115 S.Ct. 1611; *Wertz v. United States,* 51 Fed.Cl. 443, 446 (2002).

The traditional refund suit has additional batters and glacis that warrant a few words of elaboration. As recently noted by the Supreme Court, "[t]he broad language of § 1346(a)(1) mirrors the broad common-law remedy the statute displaced: actions of *assumpsit* for money had and received, once brought against the tax collector personally rather than against the United States." *Williams,* 514 U.S. at 532, 115 S.Ct. 1611; *see also Carter v. Campbell,* 264 F.2d 930, 937 (5th Cir.1959). *Indebitatus assumpsit,* indeed, afforded a remedy to those who had paid tax dollars they did not owe. *See* Ferguson, *supra,* at 327–28. Attributes of this common law action survived the passage of the Tucker Act in 1887, Act of March 3, 1887, ch. 359, 24 Stat. 505, and inhere in the modern tax refund suit, in which the claimant's *onus probandi* is to show that the United States has money which belongs to it.[9]

Viewed in terms of the twin types of claims that can arise under the Tucker Act, such refund suits fit snugly within the category of so-called "illegal exaction cases," defined by the Court of Claims in its seminal decision in *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002, 1007 (1967), as "those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." Indeed, *Eastport* and other cases specifically classify refund suits as involving such illegal exaction claims. 372 F.2d at 1007 (noting "tax refund suits" are among "those in which 'the Government has the citizens's money in its pocket' ").[10] Comparatively, then, both in its common law origins, as well as under Tucker Act jurisprudence, a tax refund suit does not involve a demand for damages based on the existence of some money-mandating statute or Constitutional provision. *See Economy Plumbing & Heating Co., Inc. v. United States,* 200 Ct.Cl. 31, 470 F.2d 585, 587–88 (1972). The latter type of "money-mandating" case, of course, involves the second major category of claim that can arise under the Tucker Act, those in which a "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." *Eastport,* 372 F.2d at 1007.

But is prejudgment interest awardable in such damage cases? It is axiomatic that "interest cannot be recovered in a suit against the Government in the absence of an express waiver of sovereign immunity from an award of interest." *Library of Congress v. Shaw,* 478 U.S. 310, 311, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986); *see also Applegate v. United States,* 52 Fed.Cl. 751, 770 (2002). In looking for such a waiver, plaintiffs train their collective eye on section 2411 of Title 28, which provides:

> In any judgment of any court rendered ... for any overpayment in respect of any internal-revenue tax, interest shall be allowed at the overpayment rate established

---

required under such section ..., nor after the expiration of 2 years from the date of mailing by certified mail or registered mail by the Secretary to the taxpayer of a notice of the disallowance."

**9.** *Stone v. White,* 301 U.S. 532, 534, 57 S.Ct. 851, 81 L.Ed. 1265 (1937); *Lewis v. Reynolds,* 284 U.S. 281, 283, 52 S.Ct. 145, 76 L.Ed. 293 (1932); *Missouri Pacific Railroad Co. v. United States,* 168 Ct.Cl. 86, 338 F.2d 668, 670–71 (1964); *cf. The Collector v. Hubbard,* 12 Wall. 1, 79 U.S. 1, 11–12, 20 L.Ed. 272 (1870). *See also* Ferguson, *supra,* at 329–31.

**10.** *See also Improvement Co. v. Slack,* 100 U.S. 648, 654, 25 L.Ed. 609 (1879) ("Moneys involuntarily paid for internal-revenue taxes illegally exacted may be recovered back from the collector in an action of assumpsit"); *American Association of Commodity Traders v. Dept. of Treasury,* 598 F.2d 1233, 1235 (1st Cir.1979); *see generally, United States v. Emery, Bird, Thayer Realty Co.,* 237 U.S. 28, 31–32, 35 S.Ct. 499, 59 L.Ed. 825 (1915); H.R.Rep. No. 659, 83d Cong., 1st Sess. 2 (1953) (noting that a refund suit seeks to "recover the amount claimed to have been illegally exacted").

under section 6621 of the Internal Revenue Code of 1986 upon the amount of the overpayment, from the date of the payment or collection thereof to a date preceding the date of the refund check by not more than thirty days ...

28 U.S.C. § 2411. This section continues— "[t]he Commissioner is authorized to tender by check payment of any such judgment, with interest as herein provided, at any time after such judgment becomes final ... and such tender shall stop the running of interest, whether or not such refund check is accepted by the judgment creditor." [11] Whether this provision applies here is dispositive—no other statutory provision supplies the prejudgment interest plaintiffs seek. *See* 28 U.S.C. § 2516(a); *Brazos Elec. Power Coop., Inc. v. United States,* 52 Fed.Cl. 121, 133–34 (2002).[12]

The case *sub judice* involves two types of claims relating to the Coal Tax—those for which plaintiffs filed a refund claim, awaited the appropriate time and then filed suit; and those for which plaintiffs did not file a refund claim and instead immediately proceeded to court. The latter claims relate back six years under the Tucker Act's general statute of limitations. 28 U.S.C. § 2501. As will be discussed below, in *Cyprus Amax,* the Federal Circuit held that, notwithstanding section 7422(a) of the Code, this court has jurisdiction over the latter type of claim. 205 F.3d at 1369. At issue in this case is whether a plaintiff prevailing as to such a claim is entitled to interest under section 2411. In other words, the question is whether plaintiffs' suits are not "for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected" under section 7422(a) and yet still are "for an[ ] overpayment in respect of any internal revenue tax" under section 2411. Before answering that question, a more complete understanding of the holding and rationale of

*Cyprus Amax* is required. To that inner curtain, the court now pushes on.

### B. *Cyprus Amax*

In *Cyprus Amax, supra,* a group of producers, sellers, and exporters of coal brought action in this court seeking return of Coal Tax payments. 205 F.3d at 1371. They alleged that the tax violated the Export Clause, as well as the Fifth Amendment's Takings Clause. The plaintiffs in *Cyprus* comprised two subgroups that seemingly ran afoul of section 7422(a) of the Code: (i) those who did not file a claim for refund with the IRS; and (ii) those who filed a claim for refund but failed to wait the requisite period before commencing suit, *see* 26 U.S.C. § 6532(a). This court, in fact, treated both subgroups as having failed to comply with the Code's prerequisites for filing a proper tax refund suit and dismissed their complaint for lack of jurisdiction, stating:

> [The] language [of Section 7422(a) ] does not permit an exception for cases in which taxpayers may believe that they are entitled to a refund because the statute on which the tax is based is unconstitutional. For that reason, we must hold that those of plaintiffs' claims that have not been submitted to the appropriate agency pursuant to [the] statute are barred.

*Cyprus Amax Coal Co. v. United States,* Nos. 97–68T, 97–310T, 97–311T, 97–317T, 97–521T, 97–522T (Fed.Cl. Feb.2, 1999). Subsequently, this court dismissed the action, with prejudice. The plaintiffs appealed.

The Federal Circuit began its opinion recounting several familiar axioms concerning the Tucker Act, among them that a claim under that act generally must be based on a so-called money-mandating provision. In this vein, it explained:

---

**11.** In so providing, section 2411 tracks the provision which authorizes the IRS to award similar interest to individuals it determines are owed an administrative refund of taxes. *See* section 6611(a) of the Code.

**12.** Plaintiffs also argue that prejudgment interest is required by the Export Clause itself, much as has been held by courts construing the Fifth

Amendment's taking clause. *See Smyth v. United States,* 302 U.S. 329, 353–54, 58 S.Ct. 248, 82 L.Ed. 294 (1937). However, since the filing of plaintiffs' original briefs, the Federal Circuit has expressly rejected this contention. *See Hohenberg Bros. Co. v. United States,* 301 F.3d 1299, 1306 (Fed.Cir.2002); *U.S. Shoe Corp. v. United States,* 296 F.3d 1378, 1382–83 (Fed.Cir.2002).

The Tucker Act is a purely jurisdictional statute; on its own predicate, it does not enable a party to recover monetary damages from the United States. *See United States v. Testan*, 424 U.S. 392, 398[, 96 S.Ct. 948, 47 L.Ed.2d 114] ... (1976); *New York Life Ins. Co. v. United States*, 118 F.3d 1553, 1555–56 (Fed.Cir.1997); *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002, 1007 (1967). Thus, to invoke jurisdiction under the Tucker Act, a party must point to a complementary substantive right found in another source of federal law, such as the Constitution, federal statutes, or executive regulations. *See [U.S. v.] Mitchell*, 463 U.S. [206] at 216[103 S.Ct. 2961, 77 L.Ed.2d 580] ... [1983]. In addition, that substantive right must be fairly interpreted as mandating compensation by the Federal Government for the damages sustained.

205 F.3d at 1373. Building on this framework, the court indicated that "[t]his appeal therefore turns on whether the Export Clause, when fairly interpreted, affords an independent cause of action for monetary remedies." *Id.* It answered the latter question affirmatively, stating:

> The necessary implication of the Export Clause's unqualified proscription is that the remedy for its violation entails a return of money unlawfully exacted. Indeed, just as Congress's power to lay taxes enables it to collect money, *see* U.S. Const. art. I, 8, cl. 1, the Export Clause's restriction on taxing power requires Congress to refund money obtained in contravention of the clause.... Thus, given a fair textual interpretation, the language of the Export Clause leads to the ineluctable conclusion that the clause provides a cause of action with a monetary remedy.

*Id.* The court found support for this conclusion in the Constitutional debates and in the Supreme Court's decision in *United States v. United States Shoe Corp.*, 523 U.S. 360, 118 S.Ct. 1290, 140 L.Ed.2d 453 (1998), which in its view, made "clear that the Export Clause includes a correlative right to money damages as a remedy for its violation." 205 F.3d at 1374. Accordingly, the Federal Circuit held that the Export Clause was, like the Takings Clause and the Compensation Clause, a rare breed, *to wit*, a money-mandating constitutional provision, invocation of which gives rise to jurisdiction under the Tucker Act.

The court next turned to the question whether, absent compliance with the refund claim provisions, such a suit for monetary damages was prohibited by section 7422(a) of the Code. It found that such a suit need not comply with the refund provisions, stating, "the cause of action based on the Export Clause is self-executing; that is, similar to the Compensation Clause, a party can recover for payment of taxes under the Export Clause independent of the tax refund statute." *Id.* In so concluding, the court relied on *Hatter v. United States*, 953 F.2d 626, 627 (Fed.Cir.1992), in which it found that the plaintiffs could seek to recover social security taxes collected by the IRS allegedly in violation of the Compensation Clause without having to file a claim for refund. The court indicated that the refund provisions were not implicated in *Hatter* because "the Compensation Clause's mandatory and unconditional language presuppose[s] damages as the remedy for a governmental act violating the compensation clause." 205 F.3d at 1374. Summarizing the application of *Hatter* to the case at hand, the court surmised: "Thus, like the plaintiffs in *Hatter*, Cyprus was not required to pursue an administrative refund claim before filing suit because the Export Clause provides a self-executing cause of action that is not subject to compliance with the tax refund statute. Put differently, Cyprus had two alternative avenues through which to obtain relief—a tax refund action or a cause of action based on the Export Clause—and either one is sufficient to invoke the Court of Federal Claims jurisdiction under the Tucker Act." 205 F.3d at 1375.

The court went on to reject various arguments made by the United States, among them the observation that neither *United States Shoe* nor *Hatter* involved the recovery of a tax payment. Finding that this assertion was "superficially appealing," but could not "withstand close scrutiny," the Federal Circuit instead ruled that "[t]he significance of *U.S. Shoe* lies not in the fact that the case involved a duty rather than a tax, but in its

affirmance of the Export Clause as providing a cause of action for money damages." 205 F.3d at 1376. On this head, it similarly rejected defendant's interpretation of *Hatter,* observing that "regardless of whether a constitutional provision refers to compensation, duty, or tax, the pertinent inquiry is whether that provision contemplates money damages as a remedy for its violation." *Id.* Citing *Mitchell,* 463 U.S. at 217, 103 S.Ct. 2961, the court reemphasized the money-mandating nature of its analysis, stating that "the touchstone of our analysis in *Hatter* and in this case is that the constitutional provision relied on by plaintiffs provides for money damages," concluding further that "given that both the Compensation Clause and the Export Clause provide for money damages, there is no principled reason why a plaintiff challenging an IRS collection may sue independently of the tax refund statutes if proceeding under the Compensation Clause but is bound to follow those statutes if proceeding under the Export Clause." *Id.*

Several important points may be distilled from this case. First, it is apparent that the Federal Circuit viewed the Export Clause as a money-mandating provision that authorized the award of money damages, thereby allowing a claimant to file an action based directly on that clause. Second, relatedly, the court viewed such a damages action as distinct from a tax refund suit, and thus divorced from the illegal exaction doctrine described in *Eastport.* That the court's opinion, on several occasions, referred to the Coal Tax as an "illegal exaction" does not suggest otherwise. *Per contra.* The overall methodology employed by the court, liberally spiced with references to *Testan, supra,* and *Mitchell, supra,* manifestly is that typically employed in identifying money-mandating provisions in the law. Third, the court concluded that a

claimant filing such a damages action need not comply with the provisions for filing a refund action and, based on this analysis, reversed this court's finding that the suits in question were prohibited by section 7422(a). *See also Hatter,* 953 F.2d at 629–30.[13] The court thus essentially concluded that an independent money-mandating type claim for money damages based upon the Export Clause does not, in the words of section 7422(a), involve the "recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected ... or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws." As will be seen, this last observation proves pivotal in this case.

Having reached the inner ward, it remains to determine whether such a lawsuit, that is, one involving a money-mandating type claim for damages, is covered by section 2411. Like a contortionist, plaintiffs contend that while its suit is not subject to section 7422(a), it is "for an[ ] overpayment in respect of any internal revenue tax" within the meaning of section 2411. Defendant, however, rejects such interpretative gymnastics, essentially asservating that if this case does not involve the "recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected" within the meaning of section 7422(a), *a fortiori,* it is also outside the confines of the interest provisions of section 2411. Resolving these contentions requires the court to examine the language, context and legislative history of the relevant provisions, a task to which it now turns.

**C. Exegesis**

As the court mounts its final assault on the bailey, it now comes face to face with the language of section 2411 itself. In construing that language, particularly as it relates to

---

**13.** In *Hatter, supra,* the Federal Circuit concluded that a damage action under the Tucker Act predicated on the Compensation Clause was not subject to the limitations of section 7422(a), explaining–

The Federal Rules of Civil Procedure permit parties to pursue their claim on any viable legal theory. Fed.R.Civ.P. 8(e)(2). In this case, plaintiffs could have pursued a tax refund. If they had, as the Claims Court noted, title 26 would have required a prior adminis-

trative claim. *See* 26 U.S.C. § 7422(a). Plaintiffs, however, did not pursue a refund. Instead they sought damages for violation of Article III, § 1—an action which is within the Tucker Act jurisdiction of the Claims Court. *Hatter,* 953 F.2d at 629. The court concluded that "[i]n sum, plaintiffs do not seek tax refunds, but compensation to ensure compliance with Article III, § 1. The Tucker Act provides the Claims Court jurisdiction to adjudicate this action." *Id.* at 630.

section 7422 of the Code, the court must first look to whether the statutory language is plain and unambiguous. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In performing this task, the court is guided by the "fundamental canon of statutory construction" that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). This rule is no less applicable in Federal tax cases. *See United States v. Goodyear Tire & Rubber Co.,* 493 U.S. 132, 138, 110 S.Ct. 462, 107 L.Ed.2d 449 (1989); *Nat'l Data Corp. v. United States,* 50 Fed.Cl. 24, 28 (2001), *aff'd,* 291 F.3d 1381 (Fed.Cir. 2002).

The cynosure here is the phrase "for any overpayment in respect of any internal revenue tax" in section 2411. Defendant does not seriously contest that the Coal Tax, which is contained in the Code, is an "internal revenue tax." *See Int'l Bus. Mach. Corp. (IBM) v. United States,* 201 F.3d 1367, 1371–72 (Fed.Cir.2000), *cert. denied,* 531 U.S. 1183, 121 S.Ct. 1167, 148 L.Ed.2d 1025 (2001). Nor does there appear to be much doubt that plaintiffs' payments of the Coal Tax resulted in "overpayments" once that tax was determined to be unconstitutional, as applied to plaintiffs, under the Export Clause.[14] And, it is even relatively clear that such an overpayment is "in respect of" an internal revenue tax. This leaves us with the innocent little three-letter word that, in the court's view, causes most of the mischief here—the treacherous preposition "for." In other words, the issue here boils down to whether a suit that under *Cyprus Amax* is viewed as seeking money damages, so as to avoid the sweeping limitations of section 7422(a), is one "for" an overpayment.

The *American Heritage Dictionary* and other familiar lexicons are not particularly helpful on this count, as they offer literally dozens of definitions, and variations thereof, for the word "for."[15] To be sure, it is not far-fetched for plaintiffs to argue that the word "for" should be given the broader meaning "in connection with" and to assert that this lawsuit is thus "for an overpayment" because an overpayment gave rise to the suit and the monetary damages awardable are obviously tied, at least in part, to the amount of that overpayment. *See Rex v. Hutner,* 26 N.J. 489, 140 A.2d 753, 754 (1958). But, it is just as logical to view the same language in section 2411 as more confining, applying only to suits whose object is the actual recovery of an illegal exaction—where the government has the plaintiff's money in its pocket and the claimant wants it back. Under this more limited reading of the statute, the case *sub judice* is not "for" an overpayment, but rather "for" damages in lieu of an overpayment. On account of this pesky preposition, then, the statutory language is susceptible of several constructions. In choosing among these, several interpretative guides are useful.

---

14. Neither the Code nor the Treasury regulations contain an all-inclusive definition of the term "overpayment." *See Estate of Baumgardner v. Commissioner,* 85 T.C. 445, 449, 1985 WL 15391 (1985). The Supreme Court, however, has construed that term on several occasions, each time applying the broad common meaning·thereof. For example, in construing the statute of limitations on filing a refund claim, the Court defined that term as–

> any payment in excess of that which is properly due. Such an excess payment may be traced to an error in mathematics or in judgment or in interpretation of facts or law. And the error may be committed by the taxpayer or by the revenue agents. Whatever the reason, the payment of more than is rightfully due is what characterizes an overpayment.

*Jones v. Liberty Glass Co.,* 332 U.S. 524, 531, 68 S.Ct. 229, 92 L.Ed. 142 (1947). Later, in *Dalm,* 494 U.S. at 609 n. 6, 110 S.Ct. 1361, the Supreme Court stated that "[t]he commonsense interpretation is that a tax is overpaid when a taxpayer pays more than is owed, for whatever reason or no reason at all."

15. Among the alternative definitions in *The American Heritage Dictionary of the English Language* 686 (4th ed.2000), ranked in order of usage, are "[u]sed to indicate the object, aim, or purpose of an action or activity;" "[u]sed to indicate the object of a desire, intention or perception;" "[u]sed to indicate equivalency or equality," "[a]s a result of; because of;" and "[a]s regards, concerning."

First, the more limited reading of section 2411 offered by defendant is consistent with the doctrine of sovereign immunity. Thus, in dealing with an analogous interest claim, the Supreme Court observed–

> [T]here can be no consent by implication or by use of ambiguous language. Nor can an intent on the part of the framers of a statute . . . to permit the recovery of interest suffice where the intent is not translated into affirmative statutory . . . terms. The consent necessary to waive the traditional immunity must be express, and it must be strictly construed.

*United States v. New York Rayon Imp. Co.,* 329 U.S. 654, 659, 67 S.Ct. 601, 91 L.Ed. 577 (1947); *see also Brookfield Const. Co., Inc. v. United States,* 228 Ct.Cl. 551, 661 F.2d 159, 165 (1981).[16] The Federal Circuit recently put it more succinctly in stating that, as to the payment of interest, "Congressional consent must be unambiguous." *IBM,* 201 F.3d at 1370, *see also U.S. Shoe Corp.,* 296 F.3d at 1381–82 (applying this principle in denying interest to exporters seeking to recover a tax violative of Export Clause). Such is not the case here, as explicit statutory language authorizing the payment of interest is certainly lacking. At best, while plaintiffs have a textual argument in support of recovery, the language of the statute just as clearly can be read restrictively, so as to foreclose the payment of interest. Under a strict application of the rules for construing waivers of sovereign immunity, plaintiffs then lose.

The latter view draws support from various cases that have concluded that section 2411 is inapplicable where the judgment does not require a refund of taxes, but rather some other form of damages. For example, in *Steiner v. Nelson,* 199 F.Supp. 441 (E.D.Wis. 1961), *aff'd,* 309 F.2d 19 (7th Cir.1962), the court determined that there was an illegal levy and granted only the relief asked for; namely, an injunction against future illegal levies and return of the money already obtained on an illegal assessment. It held that the taxpayer involved was not entitled to interest under section 2411, finding that such

a suit for injunctive relief and damages was not a suit for an "overpayment." *Id.* at 441–42. Other cases are to similar effect. *See, e.g., Craft v. United States,* 233 F.3d 358, 373–74 (6th Cir.2000), *rev'd on other grounds,* 535 U.S. 274, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) (no interest allowed under section 2411 in quiet title action brought by wife of delinquent taxpayer to recover proceeds from the illegal sale of entireties property); *Economy Plumbing & Heating Co. v. United States,* 200 Ct.Cl. 31, 470 F.2d 585, 589–92 (1972). By comparison, no case has been cited or found wherein it was held that a plaintiff/taxpayer is entitled to interest under section 2411 in a proceeding analogous to this.

Not true, protest plaintiffs. In their brief, they argue that the Federal Circuit, in *IBM, supra,* suggested that section 2411 was broad enough to encompasses lawsuits under the Tucker Act based upon the money-mandating language of the Export Clause. They rely, in particular, on that part of the court's opinion which states—"Furthermore, we accept appellee's contention that the language of § 2411 is broad enough and has been so construed, as to cover the case before us." 201 F.3d at 1372. This argument fails for at least three reasons.

First, read in context, it appears that in the quoted language, the Federal Circuit merely assumed, for the sake of argument, that this contention was true, without deciding as much. Indication of this lies in the paragraph immediately preceding the quoted language, which begins—*"[f]or purposes of analysis,* we accept the argument of appellee and the holding of the Court of Internal Trade that payment of the [Harbor Maintenance Tax (HMT), 26 U.S.C. § 4662] by exporters is an 'internal revenue tax' within the meaning of § 2411." *Id.* at 1371. Further consistent with this view, there is no discussion of this complicated issue, or any of the authorities bearing on it, in the court's opinion. Second, the court's holding in *IBM* was based on specific language in the HMT which provided that it was not to be treated as a

---

16. The roots of this principle run deep. *See, e.g., United States ex rel. Angarica v. Bayard,* 127 U.S. 251, 260, 8 S.Ct. 1156, 32 L.Ed. 159 (1888);

*Tillson v. United States,* 100 U.S. 43, 47, 25 L.Ed. 543 (1879).

tax for certain purposes, thereby rendering section 2411 inapplicable. *Id.* at 1372–1374.[17] To reach this conclusion, the court did not need to consider the language or applicability of section 2411, which was not, in any way, determinative. Accordingly, the sentence quoted by plaintiffs is, at best, *obiter dicta.* Finally, plaintiffs' assertion overlooks an obvious distinction—*IBM* preceded *Cyprus Amax* and did not involve a damage action under the Tucker Act predicated upon the money-mandating language of the Export Clause, but rather a suit filed in the Court of International Trade under its residual jurisdictional statute, 28 U.S.C. § 1581(i). As such, the court in *IBM* was not called upon to consider whether a suit for damages under the Tucker Act that falls outside the ambit of section 7422(a) is, nonetheless, covered by section 2411. Contrary to plaintiffs' importunings, then, *IBM* simply does not resolve the issue presented.

The last of the three observations made above suggests that another way of approaching this case is to compare the language of section 2411 with that of section 7422(a).[18] Both sections employ the word "for"—the former to suits "for" an overpayment; the latter to suits "for" the recovery of any "internal revenue tax alleged to have been erroneously or illegally assessed or collected, ... or of any sum alleged to have been excessive or in any manner wrongfully collected." Given the similarity between

these provisions—indeed, they clearly are in *pari materia*—it is reasonable to assume that the word "for" has the same scope in both provisions.[19] Our inquiry thus returns to whether one can have an "overpayment" of tax that somehow does not involve the erroneous, illegal or wrongful assessment or collection of tax or any other sum. The latter phrase appears to be extraordinarily broad, a fact confirmed by the case law.[20] Logic, indeed, suggests that the latter phrase is at least coextensive with the first—after all, it is difficult to envision how an overpayment could result if it did not, in the first instance, involve the assessment or collection of a tax that, in the second instance, proved erroneous, illegal or wrongful. Certainly, if nothing else, the overpayment here resulted from the collection of tax that proved to be illegal.

These observations, though perhaps splinters of logic in the first instance, take on sturdier proportions when buttressed by the legislative history of section 2411.[21] The substance of that section has long been a part of federal statutory law, with a pedigree that can be traced back to 1911, when section 177 of the Judicial Code was enacted. 36 Stat. 1141 (1911). As amended by the Revenue Act of 1921 (c. 136, § 1324(b), 42 Stat. 227), and the Revenue Act of 1926 (ch.27, § 1117, 44 Stat. 9), this provision of the Judicial Code had language essentially identical to that in section 7422(a) of the Code, to wit–

**17.** *See also U.S. Shoe,* 296 F.3d at 1382 (*"IBM* held that the Harbor Maintenance Tax statute ... expressly prohibited the application of section 2411 because it is a tax law, and not a customs law."); *BMW Mfg. Corp. v. United States,* 241 F.3d 1357, 1361–62 (Fed.Cir.2001) (same).

**18.** Almost seventy years ago, Dean Roscoe Pound wrote in his book *The Interpretations of Legal History* that "[a]ll interpretations go on analogies. We seek to understand one thing by comparing it with another." Roscoe Pound, Interpretations of Legal History 151 (1923).

**19.** Notably, some of the cited provisions originated not only the same acts, but in the same sections, only later to be separated. *See, e.g.,* section 1324 of the Revenue Act of 1921, 42 Stat. 316 (1921), allowing interest on both claims for refunds as well as prejudgment interest. Accordingly, these provisions could not be closer cousins.

**20.** *See, e.g., Brennan v. Southwest Airlines Co.,* 134 F.3d 1405, 1410 (9th Cir.1998); *Clement v. United States,* 472 F.2d 776, 778–79 (1st Cir.) (noting this provision's "broad coverage"), *cert. denied,* 414 U.S. 864, 94 S.Ct. 115, 38 L.Ed.2d 85 (1973); *Alexander Proudfoot,* 197 Ct.Cl. 219, 454 F.2d 1379, 1380 n. 2 (1972); *Nemours Corp. v. United States,* 188 F.2d 745, 750 (3d Cir.), *cert. denied,* 342 U.S. 834, 72 S.Ct. 50, 96 L.Ed. 631 (1951) (describing this provision's "broad and strict rule"); *Schiff v. United States,* 24 Cl.Ct. 249, 252 (1991). The Supreme Court has also broadly construed the comparable language of section 1346(a)(1). *See Williams,* 514 U.S. at 531, 115 S.Ct. 1611.

**21.** In the court's view, there certainly is enough ambiguity in the language of section 2411 to warrant reference to the statute's legislative history. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

(a) No interest shall be allowed on any claim up to the time of the rendition of judgment by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest, except as provided in subdivision (b).

(b) In any judgment of any court rendered after the enactment of the Revenue Act of 1926 (whether against the United States, a collector or deputy collector of internal revenue, a former collector or deputy collector, or the personal representative in case of death) *for any internal-revenue tax erroneously or illegally assessed or collected, or for any penalty collected without authority or for any sum which was excessive or in any manner wrongfully collected, under the internal-revenue laws,* interest shall be allowed at the rate of 6 per centum per annum upon the amount of such tax, penalty, or sum, from the date of the payment or collection thereof to the date of entry of such judgment or, if such judgment is reviewed by an appellate court, to the date of entry of final judgment.

Sec. 177 (emphasis added); *see also Bulova Watch Co. v. United States,* 365 U.S. 753, 758 n. 7, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961) (discussing the derivation of this provision). Accordingly, for seven years early in its existence (1921–1928), the predecessor of section 2411 contained precisely the same language now found in section 7422(a). In 1928, that language was deleted in favor of the shorter phrase "for any overpayment in respect of any internal-revenue tax." *See* Revenue Act of 1928 (ch. 852, § 614–15, 45 Stat. 791, 876–77). The legislative history, however, appears to attribute no significance whatsoever to this shift in language.[22]

Later, when Title 28 of the U.S.Code was enacted into positive law on June 25, 1948, ch. 646, 62 Stat. 869, section 2411 of that title provided only for post-judgment interest.

Nonetheless, it is revealing that this provision essentially reverted back to its 1926 form, indicating that such interest applied in suits "instituted under [28 U.S.C.] § 1346," which section, in turn, applied, as it does today, to "any internal-revenue tax ... erroneously or illegally assessed or collected ...." *See* §§ 1346, 2411 62 Stat. 933, 973 (1948); *see General Motors Corp. v. United States,* 155 Ct.Cl. 267, 292 F.2d 502, 504 n. 2 (1961). Thus, in 1948, the predecessor of the current section 2411 once again incorporated essentially the same language as current section 7422(a). As was true in 1928, there is no indication in the legislative history of the 1948 Act that the Congress thought that the return to this language was significant.[23] Nor is there indication that Congress thought it was making a substantive change when prejudgment interest was restored and the "overpayment" language reinserted via section 120 of the Act of May 24, 1949, 63 Stat. 89, 106.[24] Though amended several times since 1949, section 2411 has essentially remained unchanged insofar as relevant here.

Although plaintiffs undoubtedly would have this court see significance in Congress' ultimate deletion of the "erroneously or illegally assessed or collected" language in favor of the reference to "overpayment," this court is mindful of the Supreme Court's instruction that it "not presume that [a] revision worked a change in the underlying substantive law 'unless an intent to make such [a] chang[e] is clearly expressed.'" *Keene Corp. v. United States,* 508 U.S. 200, 209, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) (quoting *Fourco Glass Co. v. Transmirra Products Corp.,* 353 U.S. 222, 227, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957) (footnote omitted)); *see also Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 831, n. 4, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989); *Tidewater Oil Co. v. United States,* 409 U.S. 151, 162, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972). Here, there is no such clear

---

22. The accompanying reports highlight only a single change, which involved the calculation of interest and not the coverage of the provision. *See* H.R.Rep. No. 2, 70th Cong., 1st Sess. 35 (1927); S.Rep. No. 960, 70th Cong., 1st Sess. 43 (1928).

23. *See* H.R.Rep. No. 308, 80th Cong., 2d Sess. (1947) ("Reviser's Notes"), *reprinted in* 1948 United States Code Congressional Service 1917.

24. *See* H.R.Rep. No. 352, 81st Cong., 2d Sess. (1949) ("Section Explanation of Bill"), *reprinted in* 1949 United States Code Congressional Service 1273.

expression evidenced in the oscillation from one version of this language to another, suggesting no substantive change, but merely a repeated shift in phraseology.

One looking for further evidence of this need only trace the operations and history of several other statutory provisions relating to refund claims, refund suits and interest on such claims and suits. Today, most of those provisions use the "overpayment" language (*e.g.*, Code sections 6402 (authority to pay a refund claim), 6511 (requirements for filing a refund claim) and 6611 (interest on a refund claim)), but a few still employ versions of the longer formulation typified by section 7422(a) (*e.g.*, Code section 6532 (statute of limitations for filing suit after a refund claim is filed) and 28 U.S.C. § 1346(a)(1) (jurisdiction)). Yet, while differently phrased, these provisions are operatively interwoven, feeding into and interacting with each other.[25] For example, one cannot file suit under section 7422(a) until one complies with the refund claim requirements of section 6511; likewise,

the triggering of the statute of limitations under section 6532 occurs generally when a claim filed under section 6511 is denied.[26]

Like section 2411, many of the Code sections currently using the "overpayment" language originally employed the longer formulation. Yet, there is no pattern to when and how they changed; some shifts in closely-related provisions occurred decades apart and, as reflected in the accompanying legislative reports, without the slightest indication that Congress intended anything more than housekeeping.[27] Sometimes, Congress simultaneously adopted two or more provisions dealing with exactly the same subject, but ·with different language. For example, as part of the Internal Revenue Code of 1939, Congress enacted several statutes of limitation governing various tax refund claims; but each provision used a different phrase to refer to the amount sought by the taxpayer.[28] That same Code authorized the Commissioner to issue refunds to taxpayers utilizing the

---

25. For judicial confirmation of this see, *e.g.*, *Rosenman v. United States*, 323 U.S. 658, 661–63, 65 S.Ct. 536, 89 L.Ed. 535 (1945) (discussing the relationship between the statute of limitations and interest provisions of the Code).

26. A further, albeit complicated, example of this phenomenon may be found in section 6512 of the Code. Under section 6512(a), the district courts have no jurisdiction over a refund suit under section 1346(a)(1) brought by a taxpayer who has previously petitioned the Tax Court until such time as the Tax Court's decision is final. Under section 6512(b)(1), the Tax Court has jurisdiction, under certain circumstances, to determine whether there is an "overpayment of income tax." In construing these provisions, the Tax Court has held that the scope of the prohibition in paragraph (a), which hinges on section 1346 and, therefore, incorporates the "erroneously or illegally assessed or collected" language, is symmetrical with the scope of the Tax Court's "overpayment" jurisdiction under paragraph (b). *See Estate of Baumgardner*, 85 T.C. at 450–51. In this regard, the Tax Court reasoned "[t]he 'overpayment' determined by the Tax Court should be synonymous with that determined by a district court." *Id.* at 452.

27. For example, while the provision providing for interest on a refund claim (the predecessor of section 6611(a) of the Code) was changed to refer to an "overpayment" in 1928, Revenue Act of 1928, § 614, 45 Stat. 876 (1928), the provision authorizing the Commissioner to pay refunds based upon the same claims (currently found at

section 6402 of the Code) was not changed until 1954, 68A Stat. 791 (1954). The legislative history of the 1954 Code, which catalogues differences between that code and prior law, does not mention this change. *See, e.g.*, Joint Comm. on Tax'n, Summary of the New Provisions of the Internal Revenue Code of 1954, p. 129–31 (1955). A further indication that Congress painted with a broad brush in dealing with these provisions is the fact that, from 1866 through 1954, there were a number of variations of the "erroneously or illegally assessed or collected ..." language. *Compare* § 44, 13 Stat. 223 (1864) *with* § 9, 14 Stat. 11 (1866); § 19, 14 Stat. 152 (1866); § 44, 17 Stat. 257 (1872); 26 U.S.C. § 3770 (1952).

28. *See* § 3313, Stat. 400 (1939) (covering, with just a few exceptions, "[a]ll claims for the refunding or crediting of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty alleged to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected"); § 910, 53 Stat. 138 (1939) (governing estate taxes "erroneously or illegally assessed or collected"); §§ 321–22, 53 Stat. 91 (1939) (governing income tax "overpayments"). Likewise, in the 1939 Code, the provisions generally authorizing refunds used the longer formulation, while the provision authorizing gift tax refunds used the "overpayment" language. *Compare* § 3770, 53 Stat. 464 (1939) (income tax refunds), *with* § 1027, 53 Stat. 156 (1939) (gift tax refunds).

lengthy "erroneously or illegally assessed or collected" language, § 3770, 53 Stat. 464 (1939), but provided for interest on those same claims using the "overpayment" language, § 3771, 53 Stat. 465 (1939).[29] In short, based on the foregoing, the court simply cannot attach talismanic significance to the fact that the Congress at one point or another used the word "overpayment" versus the language currently found in section 7422(a). A stroll through the pages of history reveals no such recondite distinction, but instead suggests that Congress believed that the two phrases were either synonymous or, at least, not significantly different.

Confirmation of this may be found in the Supreme Court's decision in *Jones v. Liberty Glass Co.*, 332 U.S. 524, 68 S.Ct. 229, 92 L.Ed. 142 (1947). That case involved the period of limitations applicable to the filing of claims for refund of federal income taxes. The taxpayer had filed its income and excess profits tax return in 1939 and had paid an additional assessment of $6,640.81 on March 8, 1941. Over three years later, on March 30, 1944, the taxpayer filed a claim for refund of $1,053.49. 332 U.S. at 525–26, 68 S.Ct. 229. The government argued that the claim was untimely because it was not filed within two years after payment of the tax under section 322(b)(1) of the Internal Revenue Code of 1939, which involved claims for refund of income tax "overpayments." *Id.* at 526–27, 68 S.Ct. 229. The plaintiff, however, argued that it had four years after payment of the tax within which to file its claim pursuant to section 3313 of the Code, which applied to "[a]ll claims for the refunding or crediting of any internal revenue tax alleged to have been erroneously or illegally assessed or collected ... or of any sum alleged to have been excessive or in any manner wrongfully collected ..." *Id.* at 527, 68 S.Ct. 229. The latter provisions applied "except as otherwise provided by law in the case of income, war profits, excess-profits, estate, and gift taxes." *Id.*

Resolving this issue, the Court first traced the histories of these provisions, thereby verifying that Congress intended section 3313 not to apply where other special provisions controlled. The Court found that section 322(b) was such a provision, thereby requiring plaintiff to have filed its claim within two years of the relevant payment. 332 U.S. at 531–35, 68 S.Ct. 229. Plaintiff, however, argued that the two provisions did not overlap, pointing out that section 322(b)(1) dealt with income tax "overpayments," while section 3313 dealt with income taxes "erroneously or illegally assessed or collected." Attempting to distinguish the two, plaintiff asserted that overpayments referred "solely to excess payments resulting from errors by taxpayers in the preparation of their returns or in related activities, while erroneous or illegal assessments and collections are claimed to relate to various kinds of errors on the part of revenue agents." 332 U.S. at 531, 68 S.Ct. 229. As such, according to plaintiff, its situation, which involved an alleged erroneously assessed tax, was controlled by section 3313, rather than section 322(b).[30]

The Court made short shrift of this argument, first noting that "[i]n the absence of some contrary indication, we must assume that the framers of these statutory provisions intended to convey the ordinary meaning which is attached to the language they used." 332 U.S. at 531, 68 S.Ct. 229. "Hence," the court reasoned, "we read the word 'overpayment' in its usual sense, as meaning any payment in excess of that which is properly due." *Id.* "Such an excess payment may be traced to an error in mathematics or in judgment or in interpretation of facts or law," the court found, and "the error may be committed by the taxpayer or by the revenue agents." *Id.* The Court believed that the legislative history of section 322(b)(1) made it

**29.** Thus, according to plaintiffs' interpretation of the word "overpayment," under the 1939 Code, the Commissioner would have been authorized to award interest on claims on which he was not authorized to grant a refund. Despite the passage of tax legislation in 1946, 1948, 1949 and 1952, Congress did not conform the language in these two provisions until it adopted the 1954 Code. *See* § 6402, 68A Stat. 791 (1954); § 6611, 68A Stat. 819 (1954).

**30.** This argument had been adopted by several lower courts. *See United States v. Lederer Terminal Warehouse Co.*, 139 F.2d 679, 681 (6th Cir. 1943); *Huntley v. Southern Oregon Sales, Inc.*, 102 F.2d 538, 543 (9th Cir.1939).

"quite evident" that the ordinary meaning of the term overpayment was the one intended by the drafters. In this regard, the court noted that an earlier version of section 322(b)(1) had included the language "in excess of that properly due" with the "expressed intention of including claims growing out of illegal assessments." 332 U.S. at 532, 68 S.Ct. 229. Based on this, the Court found that—

> There was not the slightest indication that the substitution of the word "overpayment" was designed to narrow the scope of § 281. It apparently was a mere simplification in phraseology. But it does make clear the sense in which the word was first used in this context. The generic character of the word was emphasized from the start. And we see no basis for making it over into a word of art at this late date.

332 U.S. at 532, 68 S.Ct. 229 (footnote omitted). The Court concluded that it would "be doing unwarranted violence" to the demarcation between section 322(b) and 3313 were it to construe the term "overpayment" as not being essentially coextensive with the phrase taxes allegedly "erroneously or illegally assessed or collected." *Id.* at 532–33, 68 S.Ct. 229. It, therefore, held that plaintiff's claim for refund was subject to the two-year statute of limitations of section 332(b)(1) and, as such, untimely. *Id.* at 533–35, 68 S.Ct. 229.

Following the Supreme Court's lead, various cases have concluded that an "overpayment" occurs when a tax is erroneously, illegally, wrongfully assessed or collected. Thus, in *Kavanagh v. Noble,* 332 U.S. 535, 68 S.Ct. 235, 92 L.Ed. 150 (1947), decided the same day as *Jones,* the Supreme Court indicated that "[t]he overpayment which brings § 332(b)(1) into operation occurs whenever the taxpayer has paid an amount over and above his true liability," including within this definition a situation where an assessment and collection were "without legal authority" or "illegal." *Id.* at 538, 68 S.Ct. 235. Summarizing the law on this point, the court in *Southern California First National Bank v. United States,* 298 F.Supp. 1249, 1252 (S.D.Cal.1969), construed the word "overpayment" as used in section 6511(a), thusly—

> The United States Supreme Court has held that the predecessor section to § 6511 in the 1939 Code governed even where the tax had been illegally assessed and collected. Taxes illegally collected are, in law, "overpayments."

In similar vein runs *Dubuque Packing Co. v. United States,* 126 F.Supp. 796, 801 (N.D.Iowa 1954), where the court noted that, prior to *Jones,* lower courts had drawn a distinction between the term "overpayment" and the "erroneously or illegally assessed or collected" language. That court held that *Jones* had "refused to recognize a distinction based on this change in language and overruled those cases making such a distinction," and concluded itself that "Congress apparently must have considered the terminology synonymous." *Id.; see also Binder v. United States,* 590 F.2d 68, 70–71 (3d Cir.1978); *Taylor v. United States,* 18 Cl.Ct. 713, 716–17 (1989) (Rader, J.) (holding that the word "overpayment" in section 6511(a) "applies to claims where IRS erroneously or illegally assesses or collects taxes"); *Boyd v. United States,* 439 F.Supp. 907, 909 (E.D.Pa.1977) (funds collected pursuant to an invalid termination assessment held "overpayments" within the meaning of section 6402(a)); *cf. Wilson v. United States,* 246 F.Supp. 613, 619–20 (N.D.Cal.1965). *Jones,* and its progeny thus indicate that, despite the differences in language, the concepts embedded in sections 2411 and 7422(a) are, at least in the case of a payment or assessment of a tax, essentially synonymous.

Several observations inexorably flow from this conclusion. First, if the language in section 2411 is essentially coterminous with, or encompassed by, that in section 7422(a), then when the Federal Circuit held that cases of the sort *sub judice* are outside section 7422(a), it necessarily suggested that such suits must also be outside section 2411. A contrary conclusion would require this court to find that the word "for" is more limiting in section 7422(a) than in section 2411. Given the similarities between the structure and purposes of these provisions, such a Janus-faced rendering of the word "for" simply makes no logical or practical sense. In the court's view, the conclusion thus is inescapable that a suit for damages

arising out of the violation of the Export Clause is not a suit for an overpayment within the meaning of the interest provisions of section 2411.

Now, one might reasonably ask—and plaintiffs expressly do ask—how can defendant have the use of their funds, collected like any other tax, and yet not be required to pay compensation for the time value of that money in the form of interest. After all, "[t]he purpose of the interest provisions in tax law is to remove the factor of the time value of money from tax procedures, in fairness to the public and to the public fisc." *Mnopf Trustees Ltd. v. United States,* 123 F.3d 1460, 1465 (Fed.Cir.1997).[31] But, this claim, whether equitable under the circumstances or not, simply does not resonate in a judicial world where the doctrine of sovereign immunity is alive and well. Rather, as noted previously, "[i]n the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award." *Shaw,* 478 U.S. at 314, 106 S.Ct. 2957. Accordingly, absent a specific statutory authorization, interest on claims against the United States simply does not automatically follow upon a judgment, even where there has been some associated delay. Because there is no such provision here, plaintiffs are not entitled to the prejudgment interest they claim. Plaintiffs' claim for additional relief lies with Congress, not this court. *See Kavanagh,* 332 U.S. at 539, 68 S.Ct. 235; *IBM,* 201 F.3d at 1374–75.

Indeed, all the equities here do not flow plaintiffs' way, as becomes apparent if one considers the consequences of accepting their argument. For one thing, if plaintiffs are correct, then Congress created a form of prejudgment interest that is recoverable only by suing and obtaining a judgment under the Tucker Act. The provisions concerning the payment of interest administratively under the Code would not authorize the payment of such interest absent the filing of a timely refund claim; and such a claim, of course, would be timely, under section 6511(a), only if filed within 3 years from the time the return was filed or 2 years from the time the tax was paid. Thus, a taxpayer could not obtain administratively interest on taxes paid six years ago under the Code—rather, such interest would only be recoupable in this court under the Tucker Act. This approach is a *bete noire,* counter to the entire construct of the Code's refund provisions, which are designed to afford the IRS an opportunity to investigate tax claims and resolve them without the time and expense of litigation. *See United States v. Felt & Tarrant Mfg. Co.,* 283 U.S. 269, 272, 51 S.Ct. 376, 75 L.Ed. 1025 (1931); *see also Brennan,* 134 F.3d at 1411; *Union Pacific R.R. Co. v. United States,* 182 Ct.Cl. 103, 389 F.2d 437, 442 (1968); *Alexander Proudfoot,* 454 F.2d at 1383–84; *Ferguson, supra,* at 336 (explaining that "[t]his requirement is to assure an adequate opportunity for administrative review prior to the necessity of filing suit"); *see generally* Oliver Wendell Holmes, *The Common Law* 96 (1881) (noting that the law generally disfavors engaging the "cumbersome and expensive machinery" of the courts).

Moreover, while plaintiffs in this case filed claims for refund as to some of the taxes owed, their theory is not dependent upon this. Rather, under their view of the law, they could just as easily wait a full six years before filing suit, thereby never filing a refund claim and never providing the IRS the opportunity to refund taxes illegally collected administratively so as to stop the running of interest. In such circumstances, particularly where the illegality of a tax is admitted by the IRS, taxpayers might simply compare the rate of interest available under the Code with other investment opportunities, and, if higher, opt for the former.[32] In the court's view, it is highly unlikely that in passing

---

31. *See also Rosewell v. LaSalle Nat'l Bank,* 450 U.S. 503, 540, 101 S.Ct. 1221, 67 L.Ed.2d 464 (1981); Heather M. Pichelman, *It's Pay–Up Time for the Government on the Harbor Maintenance Tax: Exporters are Receiving their Tax Refunds, but What About Interest?,* 11 Fed. Circuit B.J. 427 (2002).

32. Under section 6621(a)(1), the overpayment rate beginning October 1, 2002, is the sum of the federal short-term rate plus 3 percentage points (2 percentage points in the case of a corporation), except the rate for the portion of a corporate overpayment of tax exceeding $10,000 for a taxable period is the sum of the federal short-term rate plus 0.5 of a percentage point for

section 2411, Congress intended to create such an investment opportunity—one, of course, that comes at the expense of the Treasury.

At all events, the result reached here is unaffected by these policy considerations and driven instead by the text of section 2411, its legislative history and statutory context, particularly the impact of section 7422(a). All of these indicia, when viewed through the prism of sovereign immunity, foreclose the construction of section 2411 urged by plaintiffs.

## III. CONCLUSION

This court need go no further. Like the Carrollian Jabberwock, plaintiffs' version of a lawsuit that avoids the limitations of section 7422(a), yet triggers prejudgment interest under section 2411, ultimately proves a fiction. Rather, for the reasons stated, this court concludes that no prejudgment interest is owed on any judgments in these cases under section 2411. Defendant's motion for partial summary judgment is **GRANTED** and plaintiffs' motions for partial summary judgment are **DENIED**.[33]

interest computations made after December 31, 1994. The rate of interest determined under this section for the calendar quarter beginning October 1, 2002, is 6 percent for overpayments (5 percent in the case of a corporation), and 3.5 percent for corporate overpayments exceeding $10,000. Rev. Rul.2002–59, 2002 I.R.B. 557. During some of the periods at issue here (*e.g.*, the last three quarters of 2000), the rate for corporate overpayments exceeding $10,000 was 6.5 percent. *Id.*

33. Also pending before the court are two other motions filed by the government: (i) a motion to dismiss several of the claims in the complaint in case No. 00–551T, filed on December 20, 2001; and (ii) a motion for summary judgment in all the cases, filed on October 31, 2002. The court will resolve those motions by separate order.