**GENERAL ELECTRIC COMPANY AND SUBSIDIARIES, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–401T.**

United States Court of Federal Claims.

May 28, 2003.

---

Patricia M. Lacey and Laurence A. Hoch, General Electric Co. and Subsidiaries, Albany, New York, and Christopher S. Rizek and Albert G. Lauber (argued), Caplin & Drysdale, Chartered, Washington, D.C., for plaintiff.

W.C. Rapp, with whom was Mildred L. Seidman, Tax Division, U.S. Department of Justice, for defendant.

Steuart H. Thomsen, Sutherland Asbill & Brennan LLP, Washington, D.C., for amicus curiae Former Aramco Shareholders.[1]

**OPINION**

ALLEGRA, Judge.

This refund suit presents a straightforward, but nonetheless difficult, question of law: whether plaintiff is entitled to additional interest on statutory interest that had accrued as of December 31, 1994, with respect to a 1978 overpayment of tax. Resolving this question of first impression requires the court to interpret a 1994 amendment to section 6621(a)(1) of the Internal Revenue Code of 1986 (26 U.S.C.) ("the Code").[2] Specifically, this court must determine whether the "interest on interest" owed plaintiff accrued at the standard rate provided by section 6621(a)(1) or at a reduced rate—the GATT rate—applicable to certain large corporate overpayments. Before turning to this highly technical issue, a brief statement of the facts is in order.

**I. FACTS**

The relevant facts are undisputed and uncomplicated:

In February 1989, plaintiff, General Electric Co. and subsidiaries ("GE"), filed a petition with the United States Tax Court concerning taxable years 1977 and 1978. Pursuant to stipulation, the Tax Court issued a decision, on July 6, 1993, which noted an overpayment of income tax for 1978 of $15,497,938. As a result of that decision, there was also an abatement of "restricted" interest totaling $11,185,064.39.[3] Abatements of these amounts for plaintiff's 1978 account were made January 10, 1994.

Pursuant to an agreement between the Internal Revenue Service (IRS) and plaintiff, the total amount of the abatements was transferred to taxable years 1977, 1986, and 1988. The amount transferred to GE's 1988 taxable year incorrectly was applied to that year as of September 30, rather than as of

---

1. By order of the court, an *amicus curiae* brief in support of plaintiff's motion for summary judgment was filed by the following former Aramco Shareholders: Mobil International Petroleum Corp., Exxon Overseas Corp., Chevron Texaco Overseas Petroleum Inc., and Texaco International Trader, Inc. Each of these companies has a separate case before this court presenting a similar interest issue.

2. This amendment was added to section 6621(a)(1) by Section 713 of the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809, 5001 (1994), and is hereinafter referred to as the "GATT amendment."

3. For a discussion of what is meant by the term "restricted interest," *see* 15 Mertens Law of Federal Income Taxation § 58A:43 (2003).

March 15, 1989, the date GE's 1998 tax liability was required to be paid. Plaintiff, therefore, was entitled to statutory interest on the amount transferred to 1998 from September 30, 1988, until March 15, 1989. During that period of time, $810,006.94 of statutory interest should have accrued on the amount transferred to 1998.

On February 4, 2002, in connection with a partial settlement agreement entered into by the parties in this action, defendant paid plaintiff the $810,006.96 of interest, together with additional interest computed thereon. However, for the period of time between January 1, 1995, and February 4, 2002, the IRS computed additional statutory interest using the lower of two possible interest rates specified in section 6621(a)(1) of the Code. On April 23, 2002, this court dismissed, with prejudice, all claims set forth in the plaintiff's June 28, 1999, complaint, "save the issue whether the reduced interest rate in section 6621(a)(1) ... should be applied to compute additional interest with respect to statutory interest that has accrued in this matter as of January 1, 1995." The latter issue is now before the court on the parties' cross-motions for summary judgment.

## II. DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

As with any issue involving a question of statutory construction, the starting point in determining the applicable rate of interest here must be the language and structure of the statute itself. *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *see also Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 835, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990); *Reese v. United States,* 24 F.3d 228, 230 (Fed.Cir.1994). Several parts of the Code are relevant here. First, section 6611(a) provides that "[i]nterest shall be allowed and paid upon any overpayment in respect of any internal revenue tax at the overpayment rate established under section 6621." As this language foreshadows, section 6621(a)(1) states:

(1) **Overpayment rate.**—The overpayment rate established under this section shall be the sum of—

(A) the Federal short-term rate determined under subsection (b), plus

(B) 3 percentage points (2 percentage points in the case of a corporation).

To the extent that an overpayment of tax by a corporation for any taxable period (as defined in subsection (c)(3), applied by substituting 'overpayment' for 'underpayment')[4] exceeds $10,000, subparagraph (B) shall be applied by substituting '0.5 percentage point' for '2 percentage points'.

The last sentence of this section was added by section 713 of the Uruguay Round Agreements Act, *supra,* which provided that this amendment "shall apply for purposes of determining interest for periods after December 31, 1994."[5] Rounding out the statutory

4. Section 6621(c)(3) of the Code defines the term "taxable period" as—"(i) in the case of any tax imposed by subtitle A, the taxable year, or (ii) in the case of any other tax, the period to which the underpayment relates."

5. This provision was one of a number added by Congress as "outlay reductions ... to assist in offsetting the projected cost of the implementing legislation" relating to the GATT treaty. S.Rep. No. 103–412, at 11 (1994); H.R.Rep. No. 103–826(I), at 9 (1994), U.S.Code Cong. & Admin.News 1994, pp. 3773, 3781. By way of further explanation, the accompanying Senate report indicated that:

As set forth below in the [Congressional Budget Office] cost estimate, the Uruguay Round

agreement includes a commitment by the United States to reduce U.S. tariffs which would cause a loss of receipts to the U.S. Treasury. As explained above, the Budget Enforcement Act and Senate Rules require that these costs be offset. Due to this pay-as-you-go requirement, it is both "necessary" and "appropriate" that provisions designed to offset the costs of the Uruguay Round agreement be included in this implementing legislation.

S.Rep. No. 103–412, at 135. The version of the statute quoted in the text above is the current version, reflecting changes not relevant herein made by § 1604(b)(1), Taxpayer Relief Act of 1997, Pub.L. No. 105–34 809, 111 Stat. 1097 (1997) and § 3302(a), Internal Revenue Service

scheme, section 6622(a) of the Code provides that "[i]n computing the amount of any interest required to be paid under this title . . . by the Secretary or by the taxpayer, or any other amount determined by reference to such amount of interest, such interest and such amount shall be compounded daily." *See generally,* Boris I. Bittker and Lawrence Lokken, Federal Taxation of Income, Estates and Gifts ¶ 114.1 (2003) (summarizing the interaction of these provisions).

Prior to its amendment by the GATT, section 6621(a)(1) established a single overpayment interest rate applicable in all circumstances. After its amendment, this section provided for two rates—one to be applied to the extent that a corporate overpayment of tax for a tax period is less than or equal to $10,000 (the so-called "regular rate") and the other, a lower rate, to be applied to the extent that such an overpayment for a taxable period exceeds $10,000 (the so-called "GATT rate"). Initially, the court's task is to construe that part of section 6621(a) which makes this distinction; then, it must determine how that interpretation differs, if at all, for an overpayment of tax that not only predates the December 31, 1994, effective date, but was fully refunded by the IRS prior to that date.[6] Restated, this court must ascertain whether, when interest alone was owed by the IRS as of the effective date of the GATT amendment, the language of section 6621(a)(1) that provides that the lower GATT rate is to apply "[t]o the extent that an overpayment of tax by a corporation for any taxable period . . . exceeds $10,000," is, nonetheless, triggered. If this question is answered "yes," then plaintiff would not be entitled to the additional interest it seeks.

As a threshold matter, plaintiff makes two pivotal concessions. First, GE concedes that if a tax overpayment of more than $10,000 arose for a taxable period concluding after December 31, 1994, then the lower GATT rate would be triggered and would continue to apply to the compounding interest attributable to the portion of the overpayment greater than $10,000 even after the underlying tax was refunded and interest alone remains unpaid. *See* Order of February 20, 2003 (filing the parties' written answers to hypotheticals posed at oral argument). Second, GE acknowledges that for taxable periods concluding after December 31, 1994, in determining whether a tax overpayment for a particular period exceeded $10,000, the dollar consequences of all the tax events or transactions properly attributable to that year would be agglomerated. (*See* Tr. of Feb. 13, 2003, at 38–39). For example, if for GE's 1998 taxable year, it was determined in 1999 that a tax overpayment of $9,000 existed and that amount was fully refunded in 2001, and then in 2001, it was determined that an additional "overpayment" for 1998 of $9,000 existed, the statute would be applied by adding the two "overpayments" together—interest on the first $1,000 of the second "overpayment" would accrue at the higher regular rate, but interest on the remaining $8,000 would accrue at the lower GATT rate. The latter would be true, according to plaintiff, even though in 2001, the total amount still owed by the IRS for 1998 did not exceed $10,000.

Of course, these legal concessions are not binding upon this court. *See Serrao v. Merit Systems Prot. Bd.,* 95 F.3d 1569, 1576 n. 5 (Fed.Cir.1996). But, even were that not true, it would seem wise to attempt to trace these concessions to the statute in an effort to better understand its language. As will be seen, such an understanding is particularly important in deciding how the statute's application is impacted by the effective date provision.

Both of GE's concessions suggest what appears obvious to the court—that there is an *accumulating function* somewhere in section 6621; that is, the statute somehow groups together all payments in excess of the tax liability for a given taxable period and if the total thereof exceeds $10,000, then the lower GATT interest applies not only to that portion of the tax overpayment that exceeds $10,000, but also, via section 6622, to any interest accruing on interest owed with re-

---

Restructuring and Reform Act of 1998, Pub.L. No. 105–206, 112 Stat. 685, 741 (1998).

**6.** In the cases of the *amici,* tax overpayments relating to taxable years predating the effective date of the GATT amendment remained outstanding as of that effective date.

spect to that portion of the overpayment. This rule holds true, apparently, even if, at some point in time, the amount of such excess payments dips below $10,000, as would occur if the tax overpayment was refunded by the IRS, but not the interest thereon.

But, where is the operative language that yields this result? Several possibilities exist. One is the precatory language in the last sentence of section 6621(a)(1)—"[t]o the extent that." But, both parties seemingly admit—and the plain language confirms—that this phrase merely establishes a benchmark that indicates both when the lower interest provision is triggered and how it functions once triggered. In other words, this language serves to indicate when the GATT interest rate applies, *i.e.*, when there is an overpayment in excess of $10,000, and to what extent, *i.e.*, to the interest owed on such excess. These words, however, do not perform the critical accumulating function, but merely operate on a quantity established by other language in the statute.

Perhaps, the accumulating function is implied by the word "exceeds." A healthy debate at oral argument, indeed, focused on the tense of this word—with plaintiff giving controlling weight to Congress' use of the present, rather than past, tense thereof, in asseverating that defendant, in applying section 6621(a)(1), should be precluded from looking back at what GE's tax overpayments were prior to the effective date of the GATT amendment. To be sure, Congress' use of a verb tense is sometimes significant. *See, e.g., United States v. Wilson*, 503 U.S. 329, 334, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992). But, not here—at least, as we will see, as an independent matter. Rather, the question posed by the statute is whether a given quantity "exceeds" $10,000 and does so ultimately and cumulatively for the taxable period in question. "To the extent" it does, the result is the triggering of the lower GATT

interest rate. Again, though, "exceeds" only operates upon a yet unidentified quantity and does not define it. The latter function thus must lie elsewhere in the statute.

So as not to prolong the suspense, the court believes that the language which yields the quantity that is then to be compared to the $10,000 benchmark is the phrase "an overpayment of tax ... for any taxable period." Consistent with the annual accounting principle of the Code, *see Burnet v. Sanford & Brooks Co.*, 282 U.S. 359, 365, 51 S.Ct. 150, 75 L.Ed. 383 (1931), the potential tax overpayment for a given taxable period—here, GE's taxable year—results from determining the tax liability for that year and comparing it to the tax payments or credits associated therewith. *See Jones v. Liberty Glass Co.*, 332 U.S. 524, 531, 68 S.Ct. 229, 92 L.Ed. 142 (1947) (An overpayment means "any payment in excess of that which is properly due"); *see also Lewis v. Reynolds*, 284 U.S. 281, 283, 52 S.Ct. 145, 76 L.Ed. 293 (1932).[7] As such, in calculating the overpayment for a taxable year, one must account for the tax liability reflected on an initial return, any adjustments later discovered by the taxpayer or by the IRS on audit, and perhaps any modifications that occur under the Code's provisions that allow for the shifting of certain tax benefits to earlier years (*e.g.*, net operating or capital loss carrybacks). What does *not* affect the calculation of the "overpayment of tax" for a taxable year is when and to what extent the IRS refunds (or credits to another taxable year) that overpayment.

Thus, while the amount of a tax overpayment for a taxable year might increase or decrease over time because, for example, the taxpayer discovers additional deductions to which it is entitled or the IRS properly adjusts income or deductions for that year, the total, once finally fixed, is the "overpayment of tax by a corporation for [that] taxable period" and is unaffected by payments made

---

**7.** In discussing how a refund suit works, the Court of Claims once explained the nature of a "tax overpayment" in the following terms:

In a refund action, the taxpayer cannot recover unless he has overpaid his tax. It is not enough that he can prevail on the particular items on which he sues, for he may have underpaid with respect to other components

entering into that tax. Only if the overall balance moves his way can he recover.

*Dysart v. United States*, 169 Ct.Cl. 276, 340 F.2d 624, 628 (1965); *see also Fisher v. United States*, 80 F.3d 1576, 1579 (Fed.Cir.1996); *Girard Trust Bank v. United States*, 226 Ct.Cl. 366, 643 F.2d 725, 727 (1981).

by the IRS that reduce the corpus of the overpayment. That is why, as GE and the *amici* readily concede, the corporate taxpayer which is entitled to, and receives from the IRS, a refund of $9,000, nonetheless triggers section 6621(a)(1), when, in a later year, it is determined that the IRS owes that taxpayer an additional $9,000. The "overpayment of tax" for that taxable period is $18,000—$10,000 of which receives compounded interest at the regular rate and $8,000 of which receives compounded interest at the lower GATT rate.

Other aspects of section 6621(a)(1) reinforce this reading. For example, the statute refers to "an overpayment," plainly indicating, at least in technical terms, that there is only one such quantity for any given taxable period. *See generally, Girard Trust,* 643 F.2d at 727; *see also* 26 C.F.R. § 301.6611–1(b); Michael I. Saltzman, IRS Prac. & Proc. ¶ 6.03 (2002); *see also Kaiser Aluminum,* 494 U.S. at 838, 110 S.Ct. 1570 (focusing on Congress' use of the singular form of a word). In the court's view, this explains why, at least for tax overpayments still outstanding as of the effective date of the statute, the lower GATT rate continues to apply in calculating interest even if the "tax overpayment" to which it relates is refunded by the IRS, leaving only interest to compound on interest. GE readily concedes this, recognizing that a contrary view would lead to an anomalous result—an increase in interest from the GATT rate to the standard rate simply because the IRS paid the overpayment sooner rather than later. But, it is hard-pressed to cite any statutory language that, consistent with its interpretation thereof, would lead to the desired concession.

Certainly, GE's view is not compelled by the notion that "an overpayment of tax" somehow accretes interest, continuously folding it into the "overpayment" as it accrues thereon, so that the GATT rate would continue to apply, for example, where the unpaid amount of accumulated interest alone exceeded $10,000 because such interest would be

deemed an "overpayment of tax." *Per contra.* All agree that unlike the statutorily-defined "tax underpayment," a "tax overpayment" does not sweep in interest accruing thereon.[8] It is instead a corpus whose amount is unaffected by the accumulation of interest. Accordingly, plaintiff is left short in trying to explain why, for purposes of calculating interest under section 6621(a)(1), a "tax overpayment" arising, for example, in 1999, is not reduced by taxes refunded by the IRS, while one arising in 1989 is so reduced. The simple answer is that, under the statute, neither a "tax overpayment" arising before the effective date nor one arising thereafter is reduced by a refund of the tax corpus. Once a "tax overpayment" is determined for a taxable year, reflecting all the taxable events, consequences or attributes associated with that year, it is fixed for purposes of determining interest rates under section 6621(a)(1).

Not so, plaintiff retorts, arguing that this interpretation would introduce unmanageable complexities into the statutory scheme, creating, with apologies to Milton, the tax equivalent of a Serbonian bog. To illustrate this, plaintiff posits a situation in which the IRS makes a subsequent adjustment in the tax owed for a particular year, resulting in a refund. Plaintiff contends that if defendant were correct, there would be no way to know whether the adjustment would be treated as reducing the first $10,000 of overpayment or the last. But, while this LIFO/FIFO scenario obviously presents issues as to the statute's application, it hardly renders it unadministerable nor even inordinately complex. Issues concerning the allocation of payments are scarcely a novelty in the tax law and, when called upon, the courts have readily supplied answers to thorny issues of this sort. *See, e.g., United States v. Energy Resources Co., Inc.,* 495 U.S. 545, 548–49, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990); *Stevens v. United States,* 49 F.3d 331, 336 (7th Cir. 1995); *Federal Nat'l Mortgage Ass'n v. Unit-*

---

8. A tax underpayment is effectively defined by statute to include accrued interest. *See* section 6601(a), (e) of the Code; *Alexander Proudfoot Co. v. United States,* 197 Ct.Cl. 219, 454 F.2d 1379, 1382 (1972). Such is not the case with a "tax overpayment." *See, e.g., Marsh & McLennan Cos., Inc. v. United States,* 302 F.3d 1369, 1378–79 (Fed.Cir.2002), *cert. denied,* — U.S. ——, 123 S.Ct. 1600, 155 L.Ed.2d 318 (2003).

ed States, 56 Fed.Cl. 228, 231–32 (Fed.Cl. 2003). Even so, the intricacies associated with the proper treatment of interest on the first $10,000 of a tax overpayment are *de minimis* for most corporations, and are dwarfed by the complexities inevitably associated with interest calculations under the Code.[9] Indeed, while courts ought to avoid an interpretation of a statute that would render it unwieldy, *see, e.g., Wyoming v. Houghton,* 526 U.S. 295, 306 n. 2, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999); *Pierce v. Underwood,* 487 U.S. 552, 567, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), such does not appear to be the case here. Rather, the foregoing discussion suggests that, once triggered, the statute requires that the interest stream owing to a given tax overpayment be carved in two—one flow attributable to the amount less than or equal to the first $10,000 of overpayment and the other to the amount greater than this figure. And while the calculation of that interest undoubtedly is more complex in practice than in theory, that does not give this court license to deviate from the statute as written. *See Marsh & McLennan,* 302 F.3d at 1381.

But these observations do not end our inquiry, for Congress arguably limited the applicability of the new GATT interest rate by an effective date provision—one that plaintiff and the *amici* argue carries the day. As noted, section 713(b) of the GATT, provided: "The amendment made by this section [amending section 6621(a)(1) ] shall apply for purposes of determining interest for periods after December 31, 1994." Plaintiff vigorously claims that this provision precludes the IRS from considering an overpayment that was discharged as of December 31, 1994, in determining whether the lower GATT rate applies. But, again, plaintiff can point to no language in the effective date provision that makes this distinction. And for good reason—there is none. Indeed, any notion that the language of this effective date provision should be limiting in the fashion plaintiff avers is belied by the accompanying committee reports, both of which describe the provision sweepingly as applying "regardless of

the taxable period (if any) to which the underlying tax may relate." S.Rep. No. 103–412, at 144 (1994); H. Rep. No. 103–826(I), at 178 (1994), U.S.Code Cong. & Admin.News 1994, pp. 3773, 3950. If anything, then, the language and legislative history of the effective date provision only confirm that section 6621(a)(1) should apply here. In fact, any notion that this effective date provision, and the GATT amendment to which it relates, are not triggered where only interest was owed as of the effective date is misplaced for several other reasons.

First, this effective date language comes to the court with a pedigree, as the same language has been used numerous times to amend the interest provisions of the Code. *See, e.g.,* § 11341(b), Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101–508, 104 Stat. 1388, 1388–471 (1990); § 1511(d), Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085, 2744 (1986); *see also* § 1463(b), Taxpayer Relief Act of 1997, *supra,* 111 Stat. at 1058. The language in these provisions is, for all intents and purposes, indistinguishable from several other effective date provisions that have indicated that other changes in the interest provisions "shall apply to [or with respect to] interest accruing after" some specified date. *See, e.g.,* §§ 1535(b), 1564(b), Tax Reform Act of 1986, *supra,* 100 Stat. at 2750, 2762; § 144(c), Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 684 (1984); § 346(d)(2), Tax Equity and Fiscal Responsibility Act (TEFRA), Pub.L. No. 97–248, 96 Stat. 324, 638 (1982).

Notable among the latter type of provisions is section 344(c) of TEFRA, *supra,* 96 Stat. at 636, which indicated that the new interest compounding provisions of section 6622 of the Code "shall apply to interest accruing after December 31, 1982." In *Gannet v. United States,* 877 F.2d 965 (Fed.Cir. 1989), the Federal Circuit concluded that the "plain language" of this effective date provision required that compound interest be applied to unassessed simple interest on unpaid taxes which had accrued prior to the effective date and which remained unpaid once the

---

9. *See, e.g., Marsh & McLennan,* 302 F.3d at 1381 (rejecting the notion that the Tax Code should be construed to avoid complexity); *see also* S. Rep.

105–174 at 66 (1998) ("The computation of interest is a complex calculation, often involving multiple interest rates.").

statute took effect. *Id.* at 968–69. The court held that this interpretation of the statute's language was fully in accord with the relevant Conference Committee Report, which provided that " '[i]n a case in which the principal portion of an obligation is satisfied, and interest remains outstanding, such interest will, of course, be compounded.' " *Id.* at 968 (*quoting* H.R. Conf. Rep. No. 760 at 595–96 (1982), U.S.Code Cong. & Admin.News 1982, p. 1190); *see also Purer v. United States,* 872 F.2d 277, 277 (9th Cir.1989) (effective date language "does not say that the new method of calculating interest will apply only to pre–1983 principal"). Relying on *Gannet,* the Eleventh Circuit subsequently construed this effective date provision as requiring the compounding of interest in a situation virtually identical to the instant one, *i.e.,* when only interest, and no tax, was owed as of the effective date. *RJR Nabisco, Inc. v. United States,* 955 F.2d 1457 (11th Cir.1992).[10]

For its part, plaintiff contends that these cases, all of which involve tax underpayments, are inapposite because the Code expressly defines a tax underpayment as including any interest thereon. This is true, but irrelevant. While, as noted above, there are differences between tax overpayments and underpayments, nothing in the core rationale of these cases suggests that these distinctions were at all relevant or determinative. Rather, the *ratio dicidendi* of these cases suggests that the broad effective date language selected simply was not amenable to a limiting construction that excluded interest, whether or not the related overpayment or underpayment of tax was paid. In essentially employing this same language in the effective date provision here, Congress is deemed to have understood its meaning, based upon prior judicial constructions thereof. The latter principle, expressed in the maxim, *priores leges ad posteriores trahan-*

tur, is well settled. *See Cannon v. Univ. of Chicago,* 441 U.S. 677, 696–98, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Raney v. Federal Bureau of Prisons,* 222 F.3d 927, 932–33 (Fed.Cir.2000); *Fluor Corp. v. United States,* 126 F.3d 1397, 1404–05 (Fed.Cir.1997); *see also Lorillard v. Pons,* 434 U.S. 575, 581, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) (where "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute"). Here, this rule of construction suggests that, based on prior judicial constructions, Congress was aware that the new GATT provision would apply even where a pre-existing overpayment had been satisfied.

Second, prior legislative history indicates that had Congress intended to restrict the application of the statute in the fashion plaintiff invites, it would have employed a different formulation. Thus, for example, on other occasions when it modified the interest provisions of the Code, the Congress applied the amendments to interest accruing with respect to deficiencies or payments "for taxable years beginning after" some date certain. *See, e.g.,* § 301(c), Taxpayer Bill of Rights II, Pub.L. No. 104–168, 110 Stat. 1452, 1457 (1996); § 414(a), Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 793 (1994); § 8(d), Act of Nov. 10, 1978, Pub.L. No. 95–628, 92 Stat. 3627, 3632 (1978); § 601(f), Revenue Act of 1971, Pub.L. No. 92–178, 85 Stat. 497, 500 (1971). As might be expected from this plain language, courts construing these provisions have held that they do not apply to interest accruing on tax underpayments or overpayments for taxable years beginning before the date specified. *See, e.g., Magnone v. United States,* 902 F.2d 192, 194 (2d Cir.), *cert. denied,* 498 U.S. 853,

---

10. Effective date language similar to that involved here was also employed by Congress in the Tax Reform Act of 1986, in amending section 6621(c)(1) of the Code to provide for broader application of an enhanced rate of interest on "any substantial underpayment attributable to tax motivated transactions." In the 1986 Act, Congress broadened the definition of a tax motivated transaction to include "sham transactions," and indicated that this amendment "shall apply to interest accruing after December 31,

1984." § 1535(b), Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085, 2750 (1986). Notably, courts construing this language had little difficulty in applying this interest provision to sham transactions that predated the effective date of the new interest provision, essentially applying the higher rate to circumstances that pre-existed the passage of the statute. *DeMartino v. Comm'r,* 862 F.2d 400, 408 (2d Cir.1988); *Gray v. Comm'r,* 88 T.C. 1306, 1328, 1987 WL 49329 (1987).

111 S.Ct. 147, 112 L.Ed.2d 113 (1990); *Weiner v. United States*, 255 F.Supp.2d 624 (S.D.Tex.2002); *see also B & M Gross Corp. v. United States*, 4 Cl.Ct. 792, 794 (1984). Accordingly, had Congress wished to draw a distinction between tax overpayments arising for taxable years beginning before or after the date of the GATT amendment, it knew how to do so. Yet, it did not employ such a formulation, instead using language that had been construed to affect the calculation of interest irrespective of the taxable period in which that interest began to accrue. In the court's view, this is yet further indication that the effective date provision here provides plaintiff no solace.

Indeed, it should not be overlooked that the practical consequence of plaintiff's position is that the United States would be subject to a higher interest rate here because it paid an overpayment of tax sooner—had it delayed paying the overpayment of tax, so that it was outstanding as of the effective date, plaintiff, by its own admission, would have been limited to GATT interest. Thus, plaintiff essentially contends that, under its construction of the effective date provision, the United States would be penalized for prompt payment or, conversely, that a corporation receiving a delayed refund should be entitled to a lower rate of interest. While, as Mr. Justice McReynolds once stated, "[l]ogic and taxation are not always the best of friends," *Sonneborn Bros. v. Cureton*, 262 U.S. 506, 522, 43 S.Ct. 643, 67 L.Ed. 1095 (1923), this court is loathe to attribute to Congress such a counterintuitive result without the flimsiest of textual support, and especially in the face of Supreme Court's subsequent admonition that courts should be "slow to attribute to Congress a purpose producing such unequal treatment among taxpayers, resting on no rational foundation." *United States v. Gilmore*, 372 U.S. 39, 48, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963); *see also Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 574, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982); *Hag-*

*gar Co. v. Helvering*, 308 U.S. 389, 394, 60 S.Ct. 337, 84 L.Ed. 340 (1940). This is not, as plaintiff claims, a matter of "undertaking to put words into the statute that, whatever the reasons may have been, Congress did not put there," *Int'l Trading Co. v. Comm'r*, 484 F.2d 707, 711 (7th Cir.1973), but rather of effectuating the words actually enacted. *See Nat'l Data Corp. & Subs. v. United States*, 50 Fed.Cl. 24, 32–33 (2001), *aff'd*, 291 F.3d 1381 (Fed.Cir.), *cert. denied*, —— U.S. ——, 123 S.Ct. 619, 154 L.Ed.2d 517 (2002).

To be sure, as plaintiff contends, the conclusion here might, at first blush, be viewed as being in tension with the generally accepted axiom that "[r]etroactivity is not favored in the law.... [C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). In fact, the construction adopted here is in no way retroactive, at least as that term is jurisprudentially understood. The GATT rate merely attaches prospective impact to the meeting of a condition as of the effective date of the statute, *to wit*, the existence of an overpayment for the relevant taxable year that exceeds $10,000. That this overpayment includes amounts that were owed by the IRS prior to the effective date does not make the statute retroactive—"[t]he mere fact that the new legislation requires reference to antecedent events or data," the Federal Circuit has stated, "does not make its application retroactive." *Travenol Labs., Inc. v. United States*, 118 F.3d 749, 754 (Fed.Cir.1997) (citing *Landgraf v. USI Film Products*, 511 U.S. 244, 269, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)).[11] Indeed, were the court's construction of the statute inappropriately retroactive as to GE, such also would be the case for all taxpayers immediately impacted by the passage of the statute, including those which GE readily admits are subject to the lower inter-

---

11. The Supreme Court has likewise stated that a statute "is not made retroactive merely because it draws upon antecedent facts for its operation." *Cox v. Hart*, 260 U.S. 427, 435, 43 S.Ct. 154, 67 L.Ed. 332 (1922); *see also Reynolds v. United States*, 292 U.S. 443, 444–449, 54 S.Ct. 800, 78 L.Ed. 1353 (1934); *Chicago & Alton R. Co. v.*

*Tranbarger*, 238 U.S. 67, 73, 35 S.Ct. 678, 59 L.Ed. 1204 (1915); *McAndrews v. Fleet Bank of Mass., N.A.*, 989 F.2d 13, 16 (1st Cir.1993) (stating that "a statute does not operate retroactively simply because its application requires some reference to antecedent facts").

est rate. *Cf. RJR Nabisco,* 955 F.2d at 1461 ("Hence, appellant's argument that the effective-date language exempts it from compound interest cannot logically follow ... unless Congress also intended to exempt all taxpayers from the operation of the statute.") There is no indication that Congress intended this result. At all events, even were the result here patently "retroactive," it would be dictated by the language Congress chose and thus not offensive to the ordinary rule regarding retroactivity—as the Supreme Court has stated, "where Congressional intent is clear, it governs." *Kaiser Aluminum,* 494 U.S. at 837, 110 S.Ct. 1570. As such, the familiar canon of construction militating against retroactive constructions is in no way offended here.

Another canon, however, arguably is applicable here: the presumption that, unless the government expressly has waived its sovereign immunity, interest, like any other charge against the government as to which immunity has not been waived expressly, may not be paid. *See Library of Congress v. Shaw,* 478 U.S. 310, 311, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) ("interest cannot be recovered in a suit against the Government in the absence of an express waiver of sovereign immunity from an award of interest"); *see also Usibelli Coal Mine v. United States,* 54 Fed.Cl. 373, 376 (2002). Here, of course, such a waiver exists in sections 6611, 6621(a)(1), and 6622 of the Code. *See MNOPF Trustees Ltd. v. United States,* 33 Fed.Cl. 755, 757 (1995), *mod. on other grounds,* 123 F.3d 1460 (Fed.Cir.1997). But, it is equally axiomatic that such waivers of sovereign immunity must be narrowly construed in favor of the government. *See Ardestani v. INS,* 502 U.S. 129, 137, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991); *OPM v. Richmond,* 496 U.S. 414, 425, 110 S.Ct. 2465, 110

L.Ed.2d 387 (1990); *United States v. Sherwood,* 312 U.S. 584, 590, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). Several courts specifically have held that this principle applies to the Code's interest provisions, *see Miller v. Alamo,* 992 F.2d 766, 767 (8th Cir.1993); *MNOPF Trustees,* 33 Fed.Cl. at 757, and, indeed, the Supreme Court implied as much in *Library of Congress* itself.[12] Of course, reliance on this rule of construction ultimately proves unnecessary here, as the plain language of the relevant provisions, as well as their legislative history, answers the question presented. Nevertheless, application of this rule seems appropriate where, as here, Congress sought to raise revenue by expressly limiting the government's exposure to interest, *see* footnote 5, *supra,* especially because adopting plaintiff's construction, taken to its logical end, would significantly delay and disrupt the flow of that revenue.[13]

## III. CONCLUSION

If plaintiff is to be believed, this is a "basket case"—so said, because GE oft-times described section 6621(a)(1) as creating two baskets: a GATT "basket" whose dollar contents were subject to the lower GATT rate and a Standard "basket" whose contents accrued interest at the normal overpayment rate. Confronted with various hypotheticals challenging its construction of the statute, plaintiff would indicate that a particular amount of tax or accrued interest belonged in one or the other of these baskets. From a tax policy perspective, GE often managed to locate a given quantity in the basket that made sense. But, just as often it could not do so consistent with its interpretation of the statute or even internally consistent with its other positions. At bottom, it appears that plaintiff has placed all of its litigative eggs in a single basket—unfortunately for it, one

---

12. In *Library of Congress v. Shaw, supra,* the Supreme Court specifically noted that 28 U.S.C. § 2411, which provides for post-judgment interest in tax refund actions, is subject to these construction rules. 478 U.S. at 318 n. 6, 106 S.Ct. 2957. If, according to the Supreme Court, this post-judgment interest provision must be construed with sovereign immunity principles firmly in mind, then such seemingly must also be the case with respect to the pre-judgment interest rules of the Code.

13. In support of its argument, plaintiff relies on statements regarding section 6621(a)(1) made by government officials in several internal IRS publications. Such statements have since been abandoned by the IRS and, for our purposes, are neither precedential nor persuasive. *See generally, Vons Cos., Inc. v. United States,* 51 Fed.Cl. 1 (2001).

that proved too rickety to resist the puissant plain language and legislative history of the statutes *sub judice*.

This court need go no further. This case has been ably briefed and argued, both facilitating and complicating its resolution. In the end, after giving full consideration to the parties' contentions, this court concludes that the GATT interest provision applies here and that plaintiff, therefore, is not entitled to the additional interest it seeks. Plaintiff's motion for summary judgment is **DENIED** and defendant's cross-motion for summary judgment is **GRANTED**. On or before June 20, 2003, the parties shall file a joint status report indicating what steps are necessary to conclude this matter, consistent with the prior settlement herein and this opinion.

**IT IS SO ORDERED.**